1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

D.M. and J.M., and their minor son, M.M.,

9

Plaintiffs,

CASE NO. C15-1390-MAT

10

v.

**MEMORANDUM OPINION**

11

SEATTLE SCHOOL DISTRICT, a municipal
Washington corporation,

12

Defendant.

13

14

<u>INTRODUCTION</u>

15

    Plaintiffs ("Parents") brought this action under the Individuals with Disabilities

16

Education Act (IDEA), 20 U.S.C. § 1400, *et seq*., to appeal the decision of an Administrative

17

Law Judge (ALJ) at the Washington Office of Administrative Hearings for the Superintendent of

18

Public Instruction as to the education of their child M.M.  The Parents aver Seattle Public School

19

District ("District" or "SPS") violated the IDEA and its implementing regulations, 34 C.F.R. §

20

300, *et seq*., and state special education law, Chapters 28A.13 RCW and 392-172A WAC.

21

    The Court conducted a bench trial on August 8, 2016, hearing argument and taking into

22

evidence exhibits and testimony by declaration.  Having now considered the parties' trial briefs,

23

the arguments presented at trial, the administrative record, and all other evidence of record, the

ORDER
PAGE - 1

Court finds and concludes as follows.

## LEGAL STANDARDS

A.    IDEA and Relevant State Law

The IDEA mandates that children with disabilities receive a free appropriate public education or "FAPE."  20 U.S.C. § 1400(d)(1)(A).  State statutes and regulations supplement the requirements of the IDEA and its implementing regulations.   *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 433 (9th Cir. 2010).

A FAPE entails special education and related services (1) provided at public expense, under public supervision and direction, and without charge; (2) meeting the standards of the State educational agency; (3) including an appropriate preschool, elementary, or secondary school education; and (4) provided in conformity with an individualized education program (IEP). 20 U.S.C. § 1401(9).  To provide a FAPE, a state educational agency must evaluate a student, determine eligibility, conduct and implement an IEP, and determine an appropriate educational placement. *J.W.*, 626 F.3d at 432 (citing 20 U.S.C. § 1414).

An IEP is a written statement, produced annually by a local education agency and designed in conjunction with a disabled child's parents, teachers, and other relevant parties. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993).  It must contain, *inter alia*, statements of the child's performance, measurable goals, criteria for measuring progress, services, aids, modifications, and supports to be provided, an explanation of the extent a child will not participate with nondisabled children in class or other activities, accommodations necessary to measure achievement and performance, and details regarding the timing, frequency, location, and duration of services and modifications.  20 U.S.C. § 1414(d)(1)(A)(i).

Placement decisions are to be made by a group of persons, including parents,

knowledgeable about the child, the meaning of the evaluation data, and the placement options, and must be determined at least annually, based on the child's IEP, and be as close as possible to the child's home.  34 C.F.R. § 300.116; WAC 392-172A-02060.  There must be consideration of the "least restrictive environment" (LRE), 20 U.S.C. § 1412(a)(5); 34 C.F.R. §§ 300.114, 300.116(a)(2); WAC 392-172A-02050, and, unless the IEP requires otherwise, a child should be educated in the school he or she would attend if not disabled, 34 C.F.R. § 300.116; WAC 392-172A-02060.  There should be a reasonably high probability of assisting the student to attain annual goals, and consideration of any potential harmful effect on the student or the quality of services needed.  WAC 392-172A-02060.

IDEA compliance entails both procedural and substantive components:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

*Board of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982) (footnote omitted).  Procedural prescriptions include, *inter alia*, timelines and the provision of notice and an opportunity to be heard.  *See J.S. v. Shoreline Sch. Dist.*, 220 F. Supp. 2d 1175, 1182 (W.D. Wash. 2002). Substantively, education must be appropriately designed and implemented such that it provides a "'meaningful' benefit."  *J.W.*, 626 F.3d at 432-33 (quoting *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)).  *Accord M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 852 (9th Cir. 2014), *amended opinion at* 2014 U.S. App. LEXIS 18979 (Oct. 1, 2014).

An appropriate public education under the IDEA does not "mean the absolutely best or 'potential-maximizing' education for the individual child."  *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987) (quoting *Rowley*, 458 U.S. at 197 n.21).  A school district must provide "'a basic floor of opportunity' through a program 'individually designed to provide

educational benefit'" to the child.  *Id.*  (quoting *Rowley*, 458 U.S. at 201).  If a district's proposed placement is "reasonably calculated" to provide a student with educational benefits, it must be found appropriate even if a more beneficial private placement exists.  *Id.*

B.    Burden of Proof

As the party seeking relief at the administrative level, the Parents bore the burden of proof in challenging the IEP and placement decision.  *Van Duyn v. Baker Sch. Dist.*, 502 F.3d 811, 819-20 (9th Cir. 2007) (citing *Schaffer v. Weast*, 546 U.S. 49, 62 (2005)).  Likewise, as the party challenging the administrative decision on appeal in this Court, the Parents bear the burden of demonstrating the ALJ's decision should be reversed.  *J.W.*, 626 F.3d at 438.

C.    Standard of Review and Deference Owed

With a challenge to the outcome of an IDEA due process proceeding, a district court receives the records of the state administrative hearing, hears additional evidence at the request of a party, and, based on the preponderance of the evidence, grants such relief as the court determines is appropriate.  20 U.S.C. § 1415(i)(2)(C).  "Thus, judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist.*, 4 F.3d at 1471.

Complete de novo review is not appropriate.  *J.W.*, 626 F.3d at 438.  *See also Van Duyn*, 502 F.3d at 817 (identifying appellate court review standards and stating:  "However, 'complete de novo review' of the *administrative* proceeding 'is inappropriate.'") (emphasis in *Van Duyn*) (quoting *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001)).  Review involves an "unusual mixture of discretion and deference," *Ojai Unified Sch. Dist.*, 4 F.3d at 1471, and the application of what this Court has referred to as a modified de novo standard,

*Miller v. Monroe Sch. Dist.*, 131 F. Supp. 3d 1107, 1112 (2015) (citing *Ojai Unified Sch. Dist.*, 4 F.3d at 1471-73).  *See also J.S.*, 220 F. Supp. 2d at 1183 (standard "has been characterized as 'an intermediate level of review between traditional administrative review and de novo review.'")

A court must accord "due weight" to the administrative decision and "must not substitute their own notions of sound educational policy for those of the school authorities which they review." *J.W.*, 626 F.3d at 438 (quoted sources and quotation marks omitted); *accord Baquerizo v. Garden Grove Unified Sch. Dist.*, ___ F.3d ____, No. 14-56464, 2016 U.S. App. LEXIS 11307 at *11 (9th Cir. Jun. 22, 2016); *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498-99 (9th Cir. 1996).[1]  The appropriate amount of deference lies within the discretion of the court. *J.W.*, 626 F.3d at 438.  Recognizing the expertise of the administrative agency, the court "'must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue[,]" and, after such consideration, "is free to accept or reject the findings in part or in whole.'" *Id.* (citations omitted).

The deference afforded the ALJ's findings increases where they are "'thorough and careful.'"  *Id.* (quoting *Capistrano Unified Sch. Dist. v. Wallenberg*, 59 F.3d 884, 891 (9th Cir. 1995)).  The court gives deference to an ALJ's decision evincing "careful, impartial consideration

---

[1] *See also Rowley*, 458 U.S. at 206 ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings."); *Wilson v. Marana Unified School Dist.*, 735 F.2d 1178, 1183-84 (9th Cir. 1984) ("[T]he court acknowledges that public education has traditionally been a function of the states. They have been given much discretion over the years in formulating educational policies and systems. 'Courts lack the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy."' The courts should not substitute their own notions of sound educational policy for those of the school authorities which they review. Therefore, we must grant deference to the sound judgment of the various state educational agencies.") (quoted sources omitted).

of all the evidence" and demonstrating "sensitivity to the complexity of the issues presented." *Id.* at 438-39 (quoted source and quotation marks omitted).

D.   Relief Available

A district court is empowered to grant such relief as determined appropriate.  20 U.S.C. § 1415(i)(2)(C)(iii).  The IDEA provides for compensatory or retrospective relief, as well as prospective relief, including an injunction directing a school district to develop and implement, at public expense, an IEP placing a student in private school.  *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985).   However, a parent or guardian is entitled to reimbursement for private school placement "*only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (emphasis in original).

BACKGROUND

A.   Summary of Factual and Procedural Background

M.M. is twelve years old and has autism spectrum disorder.  He was found eligible to receive special education services at age three and attended preschool and kindergarten at the University of Washington's Experimental Education Unit.  For first grade, the 2010-2011 school year, SPS placed M.M. at Laurelhurst Elementary School, his neighborhood/reference school. (Administrative Record (AR) 52-53.)  During this placement, M.M. engaged in significant problem behavior, including aggression toward others and behavior that was disruptive and threatened his own safety.  In March 2011, SPS transferred M.M. to a more staff intensive, self-contained (only special education) setting at Olympic View Elementary School, but the significant behavior problems continued.

In the fall of 2011, the Parents moved M.M. to the Academy for Precision Learning

(APL), a private school.  M.M. repeated the first grade at APL during the 2011-2012 school year. While M.M. continued to attend APL, SPS developed IEPs proposing to place him in public school settings, including Sacajawea Elementary for 2012-2013 and John Rogers Elementary for 2013-2014.  Until the events at issue in the current lawsuit, the parties settled their disputes without a hearing, with SPS agreeing to pay for the costs of APL from the fall of 2011 through the spring of 2014 and the Parents releasing claims through the dates of the agreements.

Dr. Kathleen Prosch-Jensen, an SPS consultant, visited M.M.'s APL program in January 2014.  SPS proposed to conduct an education evaluation, or reevaluation, in the spring of 2014. (AR 1202.)  M.M.'s father consented to this "Spring 2014 evaluation" and  SPS conducted speech language pathology (SLP) and occupational therapy (OT) evaluations.  In or around April 2014, SPS special education supervisor Dr. Sherry Studley conducted academic assessments of M.M. in reading, math, and written expression, and Sara Celms, a Board Certified Behavior Analyst (BCBA), conducted an APL classroom observation and drafted a functional behavioral assessment (FBA).  (AR 1203; *see also* AR 592, 775.) SPS did not create a draft evaluation report addressing the assessments or hold a meeting to review such a report. (*Id.*)  It provided the assessments to the Parents in or around July 2014, and drafted the results of the evaluation into the Present Levels of Performance (PLOP) section of the subsequently developed IEP.  (*Id.*)

M.M.'s IEP team did not meet to develop an IEP before the end of the 2013-2014 school year.  SPS convened an IEP meeting on September 2, 2014 and the District's school year began on the following day, before the completion of the IEP.  (AR 1207.)  The meeting participants included the Parents, APL Clinical Director Alison Moors Lipshin, APL BCBA Nicolle Simon, Dr. Studley, SPS program specialists Teresa Swanson and Alex LaRosa, and a speech language pathologist and occupational therapist (also referred to herein as "SLP" and "OT").  (*Id.*)

ORDER
PAGE - 7

SPS proposed an IEP and educational setting wherein M.M. would spend nineteen percent of his day in a general education setting, with "typically-developing peers," and the remainder of his day in a self-contained classroom (SCC) comprised of eight students, one teacher, and two instructional assistants.  (AR 1208; Dkt. 25 at 3.)  The Parents advocated for a placement like APL, in an "inclusion" classroom, with a BCBA and one-on-one ("1:1") aide. (*Id*.)   On October 3, 2014, following exchanges of drafts and comments, SPS completed the "October 2014 IEP" for the 2014-2015 school year. (AR 1586-1613.)

During the IEP meetings, SPS team members indicated M.M. would likely be assigned to Thornton Creek Elementary.  (AR 1208.)  M.M.'s Father and the Parents' expert witness, Dr. Susan Malmquist, visited Thornton Creek and, on October 7, 2013, the Parents rejected the placement.  SPS thereafter proposed M.M. transition to Thornton Creek on January 5, 2015, with interim activities to familiarize him with the program.  SPS agreed to pay APL tuition through January 5, 2015.  The Parents again rejected the placement, finding it did not meet M.M.'s needs and contending he benefited from being educated with students who are not disabled.

The Parents requested an administrative hearing on December 9, 2014.  They challenged the appropriateness of SPS's evaluations, IEP, and placement for the 2014-2015 school year, challenged the failure to provide M.M. with SLP and OT services beginning March 15, 2014, and asked whether APL was an appropriate placement.  An ALJ held a hearing between March 30 and April 8, 2015, taking testimony from M.M.'s Father, Simon, Dr. Malmquist, Moors Lipshin, a private OT, Dr. Studley, Swanson, Celms, Thornton Creek special education teacher Carissa Cook, and Dr. Prosch-Jensen.  On June 10, 2015, the ALJ issued a decision partially favorable to the Parents (AR 1199-1245), as described below.

On or about August 5, 2015, SPS proposed the "August 2015 IEP" for the 2015-2016

school year and placement in a SCC at Sacajawea Elementary.  SPS proposed this change based on the fact that Cook was no longer employed at Thornton Creek and a teacher at Sacajawea would be better qualified to work with M.M. than Cook's replacement.  The parties stipulate M.M. has difficulty with transition between schools and would have required an additional transition to a middle school for the 2016-2017 school year.

The Parents rejected the Sacajawea placement, reenrolled M.M. at APL, and, on August 31, 2015, filed the current action challenging both the administrative decision and the proposed 2015-2016 IEP and placement.  They seek the same relief sought in the administrative hearing and specifically request, *inter alia*, relief for the 2014-2015 school year and through the present, including an appropriate IEP and APL tuition expenses, and prospective placement at APL.

B.    ALJ's Conclusions

The ALJ found SPS violated the IDEA and denied M.M. a FAPE by failing to produce an evaluation report for the Spring 2014 evaluation and failing to convene an evaluation team meeting with the Parents to review that report.  (AR 1229-30 (Conclusion of Law (CL) 12-16)).  She found these procedural violations were not merely harmless error, and significantly impeded the Parents' participation in the decision-making process by not providing the opportunity to (1) discuss M.M.'s behavior and the need for a BCBA with Celms, given that Celms would have attended an evaluation review meeting, but did not attend the IEP meeting, or to (2) provide comments on the draft evaluation report before it was finalized.  (AR 1231-32 (CL 18-20).)

The ALJ did not find the October 2014 IEP substantively inappropriate as a result of the procedural violations.  The violations "barely passed the threshold" for a denial of FAPE and did not have enough of an impact on the IEP process to render the IEP inappropriate.  (AR 1232 (CL 21).)  Nonetheless, in compensation, the ALJ directed SPS to amend the IEP to provide for two

months of a guaranteed 1:1 aide, instead of the thirty days provided for, and to include this amended provision in the 2015-2016 IEP.  (AR 1244 (CL 80-81).)

The ALJ also found a procedural violation in the absence of an IEP in effect as of September 3, 2014, the beginning of the 2014-2015 school year and the date the prior IEP expired.  (AR 1232 (CL 22).)  SPS had conceded this violation and paid the Parents $21,500.00 to cover APL tuition for the first half of the school year.  (*Id*. (CL 22-23).)  The ALJ found no further remedy warranted, and noted evidence supporting a transition to a new placement after winter break was "at least as good for this particular Student, and may in fact be a better choice, than transitioning after summer break."  (AR 1244 (CL 82-83).)

Finally, the ALJ determined SPS offered inappropriate OT services beginning March 15, 2014, with deficiencies in both the 2013 and October 2014 IEPs.  (AR 1241-42 (CL 68-71 (2013 IEP contained only one, ball dribbling annual goal, while 2014 IEP reduced services from sixty minutes per week to sixty minutes per month and contained a single keyboarding motor goal)).)  The ALJ found the Parents entitled to reimbursement for out-of-pocket expenses for private OT services incurred from March 15, 2014 through the end of the 2014-2015 school year, and that the subsequent year's IEP should account for needed OT services.  (AR 1243-45 (CL 77, 84).)

The ALJ found no other procedural or substantive violations.  She found the placement compliant with the law in that it was based on the needs and services in the IEP, based on the LRE, provided a reasonably high probability of assisting M.M. to attain his goals, and considered possible harmful effects.  (AR 1242 (CL 72).)  She concluded that, excluding OT, the October 2014 IEP was reasonably calculated to provide M.M. meaningful educational benefit.  (*Id*.)

## ANALYSIS

The Parents maintain a denial of FAPE through the Spring 2014 evaluation and October

2014 and August 2015 IEPs; the predetermination of M.M.'s placement for the 2014-2015 school year; the failure to properly apply the requirements for determining M.M.'s placements and proposal of inappropriate placements for the 2014-2015 and 2015-2016 school years; the failure to provide SLP and OT services beginning March 15, 2014 and continuing through the present; and the failure to place M.M. at APL and to provide, at SPS's expense, all special education and related services, supplementary aids and services, and program modifications or supports for school personnel to which M.M. is entitled to progress and be educated in the LRE. They seek a determination as to whether APL is an appropriate placement for M.M. under the IDEA, and as to whether the ALJ erred in applying the IDEA and state special education law.[2]

A.    General Objections to Affording ALJ's Decision Deference

The Parents maintain the ALJ's decision is neither thorough, nor careful and should be afforded little deference.  Their arguments in support of this contention lack merit. As discussed below, the ALJ did not improperly consider evidence pre-dating the time periods at issue, or ignore evidence of M.M.'s progress.  The evidence supports the ALJ's conclusion that SPS provided a FAPE and, therefore, did not violate the IDEA in failing to order placement or prospective placement at APL, or reimbursement for the cost of transportation to and from APL.[3]

The ALJ also properly considered witness testimony.  "As the trier of fact, the ALJ is in the best position to assess witness credibility and the appropriate weight of testimony." *J.W. v.*

---

[2] The Court declines to consider contentions identified in the Notice of Appeal or Pretrial Order but not addressed by plaintiffs in their trial brief or at trial.  (*See*, *e.g.*, Dkt. 25 at 5 (asserting failure to dispose of all material issues of fact and law, as required by RCW 34.05.461(3), or all contested issues, as required by WAC 10-08-210(5)).

[3] While counsel stated at trial that transportation cost was also relevant to public school, the Parents sought reimbursement for transportation only to and from APL, both before the ALJ and in their trial brief.  (AR 1200-01; Dkt. 27 at 26-27.) Any issue of transportation cost associated with OT is incorporated into the discussion of OT services below.

ORDER
PAGE - 11

*Governing Bd. of E. Whittier City Sch. Dist.*, No. 10-56356, 2012 U.S. App. LEXIS 6297 at *2-3 (9th Cir. Mar. 28, 2012).  *Accord Amanda J.*, 267 F.3d at 889.  The deference owed an ALJ's decision extends to the assessment of credibility and weight assigned to witness testimony.  That is, where thorough and careful, an ALJ's consideration of witness testimony is properly afforded particular deference and improperly second-guessed.  *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942-43 (9th Cir. 2007).  Here, the APL witnesses necessarily have greater familiarity with M.M. and the education and services he is provided at that school and there is no apparent dispute as to the specific degrees, titles, or prior experience possessed by the APL or SPS witnesses.  However, it does not follow that the SPS witnesses lacked sufficient qualifications or expertise to offer their opinions, or that the ALJ improperly found those witnesses credible and their opinions, at least in some respects, entitled to greater weight than those offered on behalf of the Parents.  A review of the record, including the ALJ's extensive questioning of witnesses and the detailed factual and legal analysis contained in the administrative decision, provides ample justification for affording particular deference to the ALJ's credibility assessment and assignment of weight to witness testimony.  *See*, *e.g.*, *id.* (findings deserved particular deference where hearing officer "asked follow-up questions of many witnesses, included several pages of factual background in the decision, and discretely analyzed all the issues presented."; the court independently reviewed testimony the ALJ failed to even reference in the decision).

The Parents also state that, while the deference owed an administrative decision is premised on a hearing officer's presumed educational expertise, Washington State's education agency plays no role in the decision and the ALJ has no special expertise.  Yet, they provide no authority for a proposition that the standard employed in the review of IDEA cases differs in Washington State, and a review of case law refutes this contention.  *See*, *e.g.*, *B.S.*, 82 F.3d at

1  1498-99; *Gregory K.*, 811 F.2d at 1310-11; *Miller*, 131 F. Supp. 3d at 1112.

2  The ALJ conducted a seven-day hearing (AR 21-1108), taking the testimony of eleven

3  witnesses and fifty-nine exhibits into evidence (AR 1460-1917), as well as more than seventy-

4  five pages of post-hearing briefing (AR 1247-1333). She actively participated in questioning of

5  witnesses and took notes to later consider in rendering her decision. Her comprehensive forty-

6  eight page decision, including 105 findings of fact and eighty-five conclusions of law (AR 1199-

7  1246), shows her careful and impartial consideration of the evidence and sensitivity to the

8  complex issues posed. *See J.W.*, 626 F.3d at 438-39. The Court, therefore, gives due weight and

9  particular deference to the ALJ's decision to the extent it is thorough and careful.

10  B.    Spring 2014 Evaluation

11        1.    Failure to conduct new assessments:

12  In notifying the Parents of the need for a reevaluation of M.M., SPS identified eleven

13  areas for assessment. (AR 1772.) M.M. Father's consented to the reevaluation, indicating he

14  understood he could participate in the consideration of the areas to be assessed. (AR 1773.) He

15  wanted "to provide input and participate in decisions about what, if any, data is needed, in

16  addition to what is already available," to determine M.M.'s current performance levels and

17  service needs, and to be notified "of any evaluation activity other than the observations for the

18  FBA that the district proposes to conduct and who will conduct it" to allow for his opportunity to

19  participate in the decision as to its necessity. (*Id.*) In July 2014, SPS forwarded three documents

20  created by SPS assessors, and noted the OT assessment would follow. (AR 1777-88.) The

21  assessment results were later drafted into the PLOP of the IEP (AR 1567-72, 1589-95) and

22  discussed at the September 2014 IEP meeting (AR 1612 ("the team agreed to the content of the

23  [PLOP]")). The Parents twice submitted written comments on IEP drafts, including the PLOP

section. (AR 1809-12, 1815-24.)

The Parents take issue with SPS's failure to conduct assessments in three of the eleven areas identified in the notice/consent form.  (AR 1202-03 (Finding of Fact (FF) 8, 11).)  At hearing, Dr. Studley testified she considered, in relation to two of the three areas (study-organizational skills and adaptive/self help/life skills), information obtained from APL and through SPS interviews and observations, and that she included the third area (cognitive) in case APL had conducted relevant testing.  (AR 651.)  Consent was needed in order to conduct an FBA and show SPS had permission to observe and test M.M.  (AR 653.) The ALJ found no violation of the requirements for conducting special education evaluations.  (AR 1228 (CL 8-9).)

WAC 392-172A-03025 provides for the review of existing data for reevaluations and for a determination, on the basis of that review and with parental input, as to "what additional data, if any, are needed" to determine eligibility under the IDEA and the student's educational needs. Review may be conducted without a meeting.  WAC 392-172A-03025(3).

The ALJ here properly construed both the law and facts, finding it reasonable for SPS to not conduct new assessments in all areas, and to rely, in part, on information in its previous evaluation, then less than a year old, together with updated APL information and new assessments.  (AR 1228 (CL 9).)  She noted M.M.'s Father's understanding that SPS could use existing evaluation data in his reference to "'what, if any, data is needed, *in addition to what is already available*,'" as well as the fact that subsequent events allowed the opportunity to indicate whether the Parents thought additional data should be obtained.  (*Id.* (emphasis added by ALJ).)

The Parents misread WAC 392-172A-03025(5)(a) as requiring SPS to notify them of the decision and reasons to not secure additional data in all areas listed on the notice.  That provision requires notification upon a determination "no additional data are needed" whatsoever, WAC

ORDER
PAGE - 14

392-172A-03025(5)(a), not when additional data are needed in some, but not all areas relevant to the child's disability.  *See Hanson v. Smith*, 212 F. Supp. 2d 474, 484 (D. Md. 2002) (addressing 20 U.S.C. § 1414(c)(4) (parents must be notified as to determination and reasons "that no additional data are needed to determine whether the child continues to be a child with a disability and to determine the child's educational needs")); *accord* 34 C.F.R. § 300.305(d).

In addition, the ALJ did not improperly shift the burden of compliance from SPS to the Parents by holding them responsible for the failure to conduct additional assessments.  SPS was not required to conduct additional assessments.  The evidence, including the acknowledgement that pre-existing data could be considered and the active involvement in crafting the PLOP, disputes the contention the Parents "had no reason to expect" all assessments would not be conducted or to ask for additional data.  (Dkt. 27 at 33.)

2.      Material effect(s) of procedural violations:

As stated above, the ALJ found the failure to produce an evaluation report and convene a team meeting to review the Spring 2014 evaluation a harmful error and to "just barely" pass the threshold for a denial of a FAPE, but not rendering the IEP inappropriate.  (AR 1229-32 (CL 12-21)).  She pointed to the ample opportunity provided to and exercised by the Parents in challenging the material in the PLOP and FBA later included in the IEP.  (AR 1232 (CL 21).) She noted the Parents' vigorous participation in decision-making for the PLOP, which set forth the assessment procedures, results, and conclusions of the Spring 2014 evaluation; the opportunity to request additional assessments and their representation by able counsel at the time; their participation in the September 2, 2014 IEP meeting that included review of the PLOP;

and their extensive comments before the final IEP.  (AR 1243 (CL 78).)[4]

Not all procedural violations of the IDEA deny a child a FAPE.  *J.W.*, 626 F.3d at 452.  A hearing officer may find denial of a FAPE only where a procedural inadequacy (1) impeded the child's right to a FAPE; (2) significantly impeded the Parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE; or (3) caused a deprivation of educational benefits.  20 U.S.C. § 1415(f)(3)(E)(ii); WAC 392-172A-05105(2).  As stated by the Ninth Circuit, a FAPE is denied "'only when the procedural violation results in the loss of educational opportunity or seriously infringes the parents' opportunity to participate in the IEP formation process.'"  *J.W.*, 626 F.3d at 451-52 (quoted source omitted).

The Parents maintain the opportunity to provide input on the IEP cured nothing given that they had no evaluation report or information about evaluation team recommendations before or at the IEP meeting, and because Celms did not participate in the IEP meeting.  They maintain the lack of information compromised their full participation in the decisionmaking process and ability to advocate for needed IEP content.

The record refutes the Parents' contention they lacked sufficient information regarding the Spring 2014 evaluation.  SPS provided the evaluation assessments to the Parents in July 2014, including the information from Celms. (*See* AR 1777-88.)  It provided a draft IEP, which included the evaluation information from Celms and others in the PLOP, prior to the September 2, 2014 IEP meeting.  (*See* AR 88, 606, 655-57, 661-62, 1564-83.)  The Parents discussed the draft at the IEP meeting and actively engaged in the process of making the changes ultimately included in the final IEP.  While there is no dispute as to procedural violations, the Parents do

---

[4] The ALJ also stated: "Perhaps for these reasons, the Parents did not mention the absence of an evaluation report or meeting in several lengthy letters to the District in September and October 2014 detailing other alleged violations, and only spent six words on this claim in their complaint."  (AR 1243.)

ORDER
PAGE - 16

not establish any resulting substantive inadequacy in the October 2014 IEP.

C.     October 2014 IEP

1.     Information withheld from IEP team:

In their trial brief, the Parents alleged SPS withheld, at the time of the September 2, 2014 IEP meeting, findings and recommendations from Dr. Prosch-Jensen relating to M.M.'s program and performance at APL.  They appeared to refer to her January 2014 APL observation, which had been conducted in relation to the 2013-2014 school year and a John Rogers Elementary placement.  The Parents argued this omission denied them full and knowledgeable participation in the decisionmaking process, violated the IDEA, and rendered the resulting IEP inappropriate. *See Lafayette Sch. Dist.*, 2014 U.S. App. LEXIS 18979 at *19-31 (district failed to provide complete assessment results and related graphs to entire IEP team); *Amanda J.*, 267 F.3d at 891-94 (finding "egregious procedural violations" through failure to provide records used to identify and address student's disability; parents not informed of possibility their child had autism or that an independent psychiatric evaluation was recommended).

However, at trial, SPS provided evidence demonstrating the Parents were aware of Dr. Prosch-Jensen's observations and findings both at the time they occurred and during the formation of the October 2014 IEP.  (Trial Ex. 18.)  While counsel for the Parents clarifies they lacked information as to any recommendations, as distinguished from observations or findings, he does not identify and the Court does not find evidence any such recommendations were made. (*See id.* at 9 (February 19, 2014:  "Your letter does not indicate that Dr. Prosch-Jensen endorses the school district's view of the merits of the last-proposed IEP or that John Rogers could have successfully implemented an appropriate IEP in September had one been crafted.  As I indicated in my email last week, if Dr. Prosch-Jensen does endorse the district's stated view, the parents

ORDER
PAGE - 17

1   need to hear this from her to understand the basis of her opinion.").)  SPS did not, therefore,

2   withhold any information.

3        2.   <u>Snapshot rule</u>:

4        When considering whether an IEP and proposed education setting is appropriate, the

5   Court does not judge in hindsight.  *Adams*, 195 F.3d at 1149.  The Court looks to the IEP's

6   "goals and goal achieving methods at the time the plan was implemented and ask[s] whether

7   these methods were reasonably calculated to confer . . . a meaningful benefit."  *Id*.  This is

8   known as the "snapshot" rule:

9        Actions of the school systems cannot . . . be judged exclusively in hindsight. . . .
         An [IEP] is a snapshot, not a retrospective. In striving for "appropriateness," an
10       IEP must take into account what was, and was not, objectively reasonable when
         the snapshot was taken, that is, at the time the IEP was drafted.

11

12   *Id*. (quoting *Fuhrmann v. East Hanover Bd. of Educ*., 993 F.2d 1031, 1041 (3d Cir. 1993));

13   *accord Baquerizo* 2016 U.S. App. LEXIS 11307 at *18 (noting snapshot rule in relation to a

14   proposed education setting).  Considering this rule in *Adams*, 195 F.3d at 1149, the Ninth Circuit

15   concluded a district court erred in asking whether an IEP was adequate in light of a student's

16   progress, where the student's parents had supplemented the IEP with private tutoring, instead of

17   examining the adequacy of the IEP at the time it was designed and implemented.

18        The snapshot rule does not prevent consideration of any post-IEP information.  Later

19   acquired evidence may provide significant insight into a child's condition and shed light on the

20   objective reasonableness of a school district's decision or actions at an earlier date.  *E.M. v.*

21   *Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999, 1004-05 (9th Cir. 2011) (citing *Adams*, 195 F.3d

22   at 1149 (such later evidence is not "outcome determinative")).

23        The ALJ pointed to the snapshot rule as requiring the District's choice of placement be

ORDER
PAGE - 18

judged "principally by what was known at the time the placement was adopted, rather than by changes that occurred thereafter."  (AR 1216 (FF 60); AR 1236 (CL 40).)  While acknowledging evidence that M.M., in the 2014-2015 school year, "has spent more time in groups and less time being instructed 1:1" than in previous years, she reasoned:  "The testimony in question would be highly relevant if a prospective placement at APL were being considered.  It has little relevance to deciding the appropriateness of the District's placement choice that was made before this change occurred."  (*Id.*)  The ALJ focused on evidence relating to the 2013-2014 school year and concluded the Parents had not met their burden of showing either that their evidence was more compelling than the evidence on which SPS relied or that SPS chose an inappropriate placement.  (*Id.* (CL 39, 41).)  She found SPS did its "due diligence" in investigating APL, where M.M. had "more physical presence with typically-developing peers," before concluding he was not making significant progress or sufficiently participating with those peers due to the predominance of the 1:1 instruction.  (*Id.* (CL 41).)

The ALJ did not misconstrue the snapshot rule as preventing any consideration of evidence occurring after a contested SPS decision or action.  She appropriately found such evidence of lesser relevance than that within the possession of the District at the time the IEP and placement decisions were made.

The Parents maintain the ALJ nonetheless erred in failing to consider evidence of M.M.'s APL performance and program through either the October 3, 2015 IEP completion date or its proposed January 2015 implementation.  They argue evidence of M.M.'s tenure at APL from 2014 through 2016 prove they were correct and SPS wrong about the benefit M.M. obtained from APL and the inappropriateness of a self-contained placement.  They also contend the ALJ, while failing to consider information through the January 5, 2015 implementation date,

illogically relied heavily on Dr. Prosch-Jensen's March 2015 review of M.M.'s APL performance in the 2013-2014 school year, despite the fact that information was not actually available to the IEP team when decisions were made or when the plan was to be implemented.

The evidence of change acknowledged by the ALJ consisted of testimony provided by Moors Lipshin and Simon.  Moors Lipshin testified that, at the beginning of the 2014-2015 school year, M.M. spent at least fifty percent of his day in a general education setting.  (AR 1058-59.)  Simon testified that, in and around March 2015, M.M. spent sixty-five to seventy percent of his time in a whole group setting, nine percent in a small group, and twenty to twenty-six percent in 1:1 instruction.  (AR 193-95, 259-61.)  Moors Lipshin agreed with Simon's estimate that, at the time of the hearing, M.M. spent some eighty percent of the day in a general education setting.  (AR 426.)  Moors Lipshin also explained that this progress, as compared to the time of Dr. Prosch-Jensen's earlier observation, consisted of a lesser need for 1:1 support behaviorally, as opposed to academically.  (AR 1061-63.)[5]

The ALJ relied on the evidence from Dr. Prosch-Jensen and from Dr. Studley and Celms, the latter of whom noted in their Spring 2014 observations that M.M. "received most of his academic instruction in a 1:1 situation from an aide, and also received almost constant behavioral reinforcement or prompting from the 1:1 aide."  (AR 1215 (FF 59); *see also* AR 1205 (FF 20) ("All of the instruction [Celms] saw [M.M.] receive was from a 1:1 aide.  The whole-class activities [M.M.] participated in were a 10-minute morning meeting, snack, recess, and P.E.").)

---

[5] Moors Lipshin did not indicate whether there was any reduction in 1:1 instruction academically.  (AR 1062 ("A[:]  So for behavioral supports in a group instruction the Student has made gains that require him to have less of parapro support behaviorally.  He still requires parapro support for individualized instruction of the academic skills that he's significantly behind in.  But, throughout his day, compared to when the visitor came in January of 2014, the parts of his day that are directly being intervened by his parapro are less."; "Q[:]  You said that he still needs the one-on-one support academically but the amount of time that the paraeducator is having to spend with him working on his behavior has reduced this year -- .  A[:]  Yes."))

"Ms. Celms and Dr. Studley . . . believe the Student could receive more academic and social benefit working in groups of two or three children receiving specially designed instruction at a similar level, instead of receiving 1:1 instruction in a classroom where others are working significantly above his instructional level."  (AR 1215-16 (FF 59).)

As reflected in a case cited by the Parents, the snapshot rule found inappropriate the use of "a child's *subsequent* progress as a measure of a plan's adequacy."  *Marc M. v. Dep't of Educ.*, 762 F. Supp. 2d 1235, 1243 (D. Haw. 2011) (emphasis in original).  The *Marc M.* plaintiffs were not asking for consideration of subsequent progress to determine whether an IEP was appropriate.  *Id.*  They established vital documentation provided to the school district weeks in advance of the IEP's implementation had been excluded from the development process.  *Id.*

The Parents' assignment of error relies on evidence provided in April 2015, through testimony at hearing.  There is no indication SPS was privy to the substance of that testimony either at the time of the October 2014 IEP or the January 2015 implementation date.  The ALJ appropriately judged the IEP and educational placement by what was known at the time of the placement choice and implementation date, not on evidence of M.M.'s subsequent progress.  *See*, *e.g.*, *Adams*, 195 F.3d at 1149-50 (while witnesses offered well-informed testimony as to a different program, the IEP was reasonably developed based on information available to the IEP team and sufficient to confer a meaningful benefit); *D.R. v. Dep't of Educ.*, 827 F. Supp. 2d 1161, 1171-72 (D. Haw. 2011) ("[T]he IEP cannot be judged in light of information that no party had when the IEP was developed.").

The Parents also fail to persuade that the ALJ illogically or heavily relied on evidence from Dr. Prosch-Jensen that was not available to the IEP team.  Both sides offered expert testimony and the snapshot rule does not prohibit consideration of such later acquired evidence.

1    The ALJ reasonably found the evidence from SPS more persuasive.

2          The Court finds no error in relation to the discussion of a prospective placement.  The

3    portions of the decision discussing evidence of progress and the snapshot rule specifically

4    addresses the October 2014 IEP.  (AR 1215-16, 1234-36.)  The ALJ earlier acknowledged that

5    the Parents sought M.M.'s prospective placement as a remedy, but only ordered prospective

6    relief for OT services for the 2015-2016 school year.  (AR 1201, 1244-45.)  However, to receive

7    tuition reimbursement or prospective placement in a private program, the Parents must first

8    prove the program offered by the District was inappropriate.  *See Sch. Comm. of Burlington*, 471

9    U.S. at 370 (where a court determines a private placement desired by the parents was proper and

10   an IEP calling for placement in a public school was inappropriate, "it seems clear beyond cavil

11   that 'appropriate' relief would include a prospective injunction directing the school officials to

12   develop and implement at public expense an IEP placing the child in a private school."); *J.S.*,

13   220 F. Supp. 2d at 1184 n.4 ("in the event the ALJ's conclusion that the district provided FAPE

14   was overturned, then and only then would an examination of the appropriateness of the

15   residential placement be at issue.")  In this case, the ALJ found the IEP and placement for 2014-

16   2015 appropriate, and issued her June 2015 decision two months prior to the August 2015 IEP

17   for the following school year.   (Trial Ex. 6.)  She did not, under these circumstances, err in not

18   separately addressing the claim for prospective relief for the 2015-2016 school year.

19          3.      Failure to consider current information:

20          The Parents aver SPS failed to comply with its duty to base the IEP on M.M.'s "present

21   levels" of academic achievement and functional performance, or its continuing duty to revise the

22   IEP even after its completion.  20 U.S.C. §§ 1414(d)(1)(A)(i)(I), (d)(4)(A)(ii)(III); 34 C.F.R. §§

23   300.320(a)(1), 300.324(b)(2); WAC 392-172A-03090(1)(a), -03110(3)(b)(iii).  They describe the

ORDER
PAGE - 22

SPS observations as predating the October 2014 IEP by some five to nine months, and contend they told SPS about M.M.'s increased motivation, performance, independence, and time spent in group instruction with nondisabled peers in September 2014, and asked SPS to get further information from APL.  They maintain they again reported current improved functioning and benefit from inclusion in October 2014 and in their December 9, 2014 hearing request.[6]

These arguments lack merit.  The assessments, observations, and data collection performed as a part of the SPS evaluation occurred between April and June 2014, and the initial IEP draft predated the September 2, 2014 meeting.  (AR 606-11, 1777-89.)  SPS appropriately relied on this evidence as reflecting M.M.'s then current status.  It is also noteworthy that the Parents had similarly identified, in December 2013, academic gains and increases in M.M.'s motivation to participate and engage in group settings.  (Trial Ex. 18 at 4.)

The record refutes the contention the Parents provided and SPS ignored more current information.  For example, the September 2014 comments regarding the proposed IEP do not identify the specific increases or improvement here alleged, or request SPS acquire further information from APL as to such advances.  (Dkt. 27 at 30 (citing AR 1819).)  That document, as others before and after it, more generally addresses the Parents' desire that M.M. be placed in a class with nondisabled students, and observes that SPS could contact Moors Lipshin for confirmation or further explanation as to the benefits of such placement.  (*Id.*; *see also* AR 1809-

---

[6] SPS argues the Parents failed to exhaust this claim by raising it at the administrative level.  *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 952 (9th Cir. 2010) (district court lacked subject matter jurisdiction to consider unexhausted claim); *Marc M.*, 762 F. Supp. 2d at 1241 ("[A]rguments not raised in front of a hearings officer cannot be raised for the first time on appeal to the district court.")  However, the Court here, as elsewhere in this opinion, takes the opportunity to address claims on the merits.

ORDER
PAGE - 23

12, 1815-24, 1834.)[7]   The Parents' comments, moreover, reflect that M.M. continued to be educated 1:1, albeit while he was physically present in a group setting.   (*See* AR 1819 (September 16, 2014: "[T]he IEP incorrectly states that, 'Currently, all of Michael's reading, writing, and math instruction is completed individually, with constant one-on-one support from an instructional assistant [IA].'   The reason for the second phrase is unclear.   [M.M.]'s IA is acting as an instructor in these subjects, rather than as a support while he is participating in other instruction.   [M.M.] needs one-on-one precision teaching to progress in these areas.   Presumably, the District would not have him be without instruction while participating in these subjects."); AR 1823 ("At APL, [M.M.] is learning to follow regular classroom general rules and meet this environment's expectations, including those for making transitions.   Regardless of much [sic] one-on-one support he needs to acquire this benefit along the way, he will be substantially more independent in his ability to function in the world at large than he would otherwise be."); AR 1834 (October 29, 2014: "APL's design enables him to be educated with nondisabled students learning the general education curriculum and receive the individualized instruction that he needs.   Those who know [M.M.] believe there is little reason to anticipate that he would require less individual attention in the classrooms observed at Thornton Creek."))

To the extent the Parents advised SPS of specific evidence of progress or change at APL after the October 2014 IEP (*see* AR 1424-25 (December 9, 2014 due process hearing request pointing to progress in academic and other skills, and increases in motivation to participate successfully in groups and engagement in group settings)), there was no violation of a duty to

---

[7] The draft specifically requests inclusion of statements that M.M. "needs typical social models to motivate him to conform" his behavior, "is able to learn from observing how typically-developing students behave," requires their feedback to change, pays attention to and accepts that feedback, and "does not respond with this level of motivation" to behavior or comments from adults.  (AR 1819.)

review and revise the IEP.  A school district has "an affirmative duty to review and to revise, at least annually, an eligible child's IEP." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir. 2012).  *Accord* 20 U.S.C. § 1414(d)(4)(A)(i) (the IEP team "reviews the child's IEP periodically, but not less frequently than annually").  It must also revise IEPs as appropriate to address, *inter alia*, information provided to or by the parents.  § 1414(d)(4)(A)(iii).

However, the Parents do not identify an affirmative, independent duty on the part of a school district to continually review and revise an IEP throughout the year after an annual IEP and proposed placement has been rejected and a child placed in private school.[8]  As SPS argues, a school district could not, for example, reasonably be required to revise an IEP to address any lack of expected progress toward annual goals, § 1414(d)(4)(A)(ii)(I), where the IEP was rejected, leaving no goals to measure or track.  The duty to revise is more reasonably understood as requiring, in addition to an annual IEP, that a school district remain ready to review and revise upon notice a private school student wishes to return to public school.  *See* 64 Fed. Reg. 12, 601 (1999) (school district "must be prepared to develop an IEP and to provide FAPE to a private school child if the child's parents re-enroll the child in public school.")

4.    Information and reasons considered:

The Parents assert a court may only consider programming or services specified in an IEP.  *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768, 770 (6th Cir. 2001) (IEP must be evaluated as written and court review limited to assessment of terms of document itself; court

---

[8] This is distinguishable from a school district's failure to prepare an annual IEP for a student unilaterally placed in private school.  *See*, *e.g*., *Dep't of Educ., State of Haw. v. M.F.*, 840 F. Supp. 2d 1214, 1229-31 (D. Haw. 2011) (State violated the IDEA "by not at least attempting to prepare an IEP at the beginning of [two school years].")  It is also distinguishable from the case of *Noce v. Dist. of Columbia*, No. 13-1133, 64 IDELR 112 (D. D.C. Sep. 18, 2014) (attached at Dkt. 34), wherein a school district was ordered by an ALJ to conduct an IEP meeting and, in that meeting, refused to make requested changes to an IEP because the student had been parentally placed in a private school.

erred in assessing appropriateness of program based on what a placement could or might have provided, rather than what IEP "actually promised").   The Parents maintain the ALJ improperly considered elements they expressly sought and staff claims of what could be done, where those elements – data maintenance and analysis using Applied Behavior Analysis, regularly-occurring staff training and support activities, frequent meeting with aids and review of data, and preteaching challenging concepts before in-class exposure – were not included in the IEP.

The Parents also state that any reason for a school district decision or action not set forth in a prior written notice (PWN) or in a complaint response cannot be considered.  *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994) (requirement that a school district provide a formal written offer before initiating a placement helps to guide parental decisions, eliminate factual disputes, and assist parents in presenting complaints, and should be "enforced rigorously.")  They aver evidence admitted and considered in the hearing decision for the refusal to fund M.M.'s placement at APL should have been limited to the reasons stated in the PWN and response to the complaint; that is, that SPS offered M.M. a FAPE and that a service model that requires M.M. to have an instructional assistant fosters dependence.  (AR 1612-13, 1379-87.) The Parents argue the ALJ improperly cites to reasons for SPS's opposition to the APL placement only raised by SPS at hearing, such as APL being noisy, overuse of candy as a reward, too little time spent working, and questions as to M.M.'s progress.  They suggest SPS contrived the alleged inadequacy of M.M.'s progress at APL after filing its response to the complaint.

A contention the ALJ should have ignored the Parents' own arguments as to deficiencies in the IEP makes no sense.  The ALJ's thorough and careful decision properly considered arguments raised by the Parents.  (*See*, *e.g.*, AR 1239-40 (CL 54-60).)  The ALJ also properly considered arguments and evidence presented by SPS associated with the program outlined in

the IEP, describing the proposed placement, and addressing the appropriateness of a placement at APL. "In an appeal of an administrative decision brought under IDEA, a court may - indeed, in some cases must - review and decide genuine issues of material fact by a preponderance based on evidence in the record and any additional evidence offered by the parties, in addition to the findings of the ALJ." *J.S.*, 220 F. Supp. 2d at 1184.

The Parents, for example, raised a claim that APL was the appropriate placement for M.M. and bore the burden of proof in relation to that claim. Addressing a motion in limine, the ALJ rejected the Parents' argument SPS could not introduce evidence of M.M.'s progress at APL to rebut the Parents' claim because the facts were not explicitly addressed in the PWN or the District's answer to the complaint. (*See* AR 17-19, 1334-44.) She reasonably concluded SPS had a right to present evidence to defend against the Parents' claim, and that such evidence was relevant to, among other things, the issue of prospective placement. (AR 17-19.)

The Court also finds no IDEA violation established by the ALJ's statement that "[i]t is impossible to list every teaching technique and methodology in an IEP, nor it is required." (AR 1239-40 (CL 56, 58).) This observation was responsive to specific IEP deficiencies alleged by the Parents, and is not, read in context, reasonably construed as providing an assessment of possible, but not actual program or placement. The ALJ, for instance, reasonably addressed the absence of an accommodation of "Repeat/paraphrase/clarify/simplify directions" as follows:

> [T]his is a teaching technique or methodology that would naturally be used in an SCC like the one to which the Student was assigned, and used by aides who accompany the SCC students to general education classes. . . . It is unnecessary to list this one in this Student's IEP. The situation would be different for a child who participates in general education classes without an aide, where the general education teacher may not otherwise employ this teaching technique, so it must be listed in the IEP. The decision what to list must be based on the individual needs of the student and the settings in which he or she will be receiving instruction. In the present case it is unnecessary to list this teaching technique in the IEP.

ORDER
PAGE - 27

(AR 1239 (CL 56).)  The ALJ did not err in reaching this common sense conclusion.  (*See also*

*supra* at 32-33 (discussing similar reasoning in relation to pre-teaching accommodation).)[9]

5.   <u>Substantive deficiencies</u>:

a.   <u>M.M.'s primary strength</u>:

The IEP team must consider the strengths of a child and the concerns of the parents for

enhancing their child's education.  20 U.S.C. § 1414(d)(3)(A)(i)-(ii).  The Parents assert SPS

ignored M.M.'s "primary strength – his motivation to acquire and ability to model social and

learning behavior of nondisabled peers" – and their request for his education with such peers to

the maximum extent appropriate.  (Dkt. 27 at 35.)  However, the IEP explicitly acknowledged as

a strength M.M.'s preference to participate in activities with his APL classmates and the Parents'

desire that he be educated in classes with nondisabled students.  (AR 1588.)

SPS was not required to adopt the Parents' preferred IEP content.  *See Ms. S. v. Vashon

Island School Dist*., 337 F.3d 1115, 1131-32 (9th Cir. 2003) (school districts are not obligated to

grant parents a veto over any individual IEP provision).  As stated by the Ninth Circuit:

> [A]lthough the formulation of an IEP is ideally to be achieved by consensus
> among the interested parties at a properly conducted IEP meeting, sometimes such
> agreement will not be possible. If the parties reach a consensus, of course, the
> [IDEA] is satisfied and the IEP goes into effect. If not, the agency has the duty to
> formulate the plan to the best of its ability in accordance with information
> developed at [prior] meetings, but must afford the parents a due process hearing in
> regard to that plan.

*Doe by Gonzales v. Maher*, 793 F.2d 1470, 1490 (9th Cir. 1986), *superseded on other grounds*

---

[9] Also, neither the October 2014 IEP, nor the PWN are as limited as described by the Parents.
The IEP pointed to data collection procedures including daily point sheets on social, behavioral, and study
skill goals, while the PWN acknowledged the desire that M.M. be educated in a general education
environment, with a BCBA. (AR 1610, 1612).  The PWN contrasted the APL "'general education'"
setting as one in which M.M. required "direct and substantial support from one to two adults for most of
the day" and some fifteen minutes of independent time for academic instruction, with the SPS proposal
for a smaller and more highly structured setting in which M.M. could gain greater independence.  (*Id*.)

1    *by* 20 U.S.C. § 1414(d)(1)(B).  The Parents do not here identify any substantive deficiency in the

2    IEP or error by the ALJ, who addressed the issue in detail, but declined to reach the conclusion

3    desired by the Parents.  (*See* AR 1215-17 (FF 58-64), 1234-36 (CL 34-41).)

            b.    Present levels of academic achievement and functional performance:

4

5            The IEP must include a statement of present levels of academic achievement and

6    functional performance, including how the disability affects involvement and progress in the

7    general education curriculum, a statement of measurable annual goals designed to enable the

8    student to be involved and make progress in the general education curriculum and meet other

9    educational needs, and a description of how progress on meeting annual goals will be measured.

10   20 U.S.C. § 1414(d)(1)(A)(i)(I)-(III).  The Parents maintain the present levels of academic

11   achievement and functional performance in the IEP are outdated and inaccurate, particularly with

12   respect to the extent to which M.M.'s disability prevents him from being involved and

13   progressing in the general education curriculum with nondisabled peers.  They contend the IEP

14   understates his functioning levels and refuses to acknowledge his motivation to acquire and

15   model his behavior on nondisabled peers, and that inaccurate or outdated performance levels

16   compromise baseline performance levels in annual goals, causing some target performance levels

17   to reflect too little growth.  They also aver a failure to acquire the necessary information from

18   APL prior to IEP meetings.

19           A review of the October 2014 IEP, and the ALJ's consideration of its content, refutes the

20   Parents' contention of the above-described substantive deficiencies.  (*See* AR 1586-1613 and AR

21   1234-42.)  The record also reveals the Parents' active participation in the formulation of the IEP.

22   This issue presents no more than a difference in opinion as to specific IEP content.

23

ORDER
PAGE - 29

c.      BCBA and staff training:

The IEP must include a statement of services, supplementary aids, and program modifications or supports for school personnel allowing for a student's advancement toward attaining annual goals, involvement and progress in the general education curriculum, participation in extracurricular and other nonacademic activities, and education and participation with disabled and nondisabled children.  20 U.S.C. § 1414(d)(1)(A)(i)(IV).  The October 2014 IEP provided for training and ongoing support/communication with a behavior specialist knowledgeable about autism as needed, but not for a BCBA.  (*See* AR 1606-07, 1609, 1612-13.) The PWN noted the District program created and run by special education staff at the University of Washington (UW), providing support and training to teachers and classroom staff working with students on the autism spectrum.  (AR 1612.)

The Parents take issue with the IEP's omission of a BCBA for training and ongoing programming, as well as the adequacy of staff training as a general matter.  Their argument suggests the ALJ should have favored their witnesses' testimony over the testimony of SPS witnesses, the latter of whom are not BCBAs.  They also point to guidance and case law supporting the proposition that training should be specific to a student's needs, not general staff training.  The Parents, however, fail to demonstrate the October 2014 IEP did not provide for sufficient behavioral support or training.

As observed by the ALJ, in addition to the resources provided by the UW program, the Districts' behavioral specialists program included one specialist, then a month away from receiving her BCBA certification and providing on-site support to Thornton Creek teachers usually every other week and sometimes weekly, as well as on-site supervision by Dr. Studley three-to-four times a month.  (AR 1215 (FF 55).)  The SCC teacher and classroom staff engage

ORDER
PAGE - 30

in daily data collection, weekly analysis of that data, and weekly adjustments to student programming based on that analysis, with weekly analysis the same interval described by the APL BCBA.  (*Id.* and AR 1237 (CL 42); *see also* AR 1217-18 (FF 65-66).)  SCC teacher Cook testified she did not feel the need for a BCBA given the assistance already available through her supervisors, and that she is able to appropriately address student behavior, make adjustments to student programs as needed, and has expert resources to call upon.  (*Id.*)  The ALJ reasonably concluded that, while supervision and training by an on-site BCBA may be "superior and closer at hand" than that provided in the SCC, the IDEA requires "not what is superior, but what provides a basic floor of opportunity" and a meaningful educational benefit.  (AR 1237 (CL 42-43).)  *See Gregory K.*, 811 F.2d at 1314, and *J.W.*, 626 F.3d at 439.

The ALJ also concluded the Parents had not established SCC staff needed a specific training plan and number of hours of training in place, given that, with three educators serving eight children, SPS reasonably determined the SCC teacher would have time to focus on M.M.'s needs.  (AR 1238 (CL 47).)  She acknowledged unpredictable behavior was a characteristic of children with autism, that M.M. was unusual in having a lot of difficulty learning and retaining component skills, while being able to understand some higher level concepts, and reasoned: "Every child is a unique individual, and every child with autism is a unique individual.  But that does not mean every teacher requires a training plan and training hours specific to every child." (*Id.*)  Considering this reasoning, as well as the training and support provided for in the IEP and by district programs, the Parents do not undermine the sufficiency of the October 2014 IEP.

d.    Preteaching:

The IEP did not include an accommodation of preteaching difficult concepts to be introduced in the general curriculum.  In finding the IEP appropriate, the ALJ stated:

ORDER
PAGE - 31

1
2
3
4
5

> District witnesses explained that the Student is unlikely to need pre-teaching except for his general education science class, because for all other academics [sic] subjects he will be taught in groups of two or three special education students at a lower level of complexity and will not be exposed to an unmediated general education curriculum.  Again, it is impossible to list every teaching technique and methodology in an IEP, and it is not required.  This accommodation is a teaching technique that would be important to include in the IEP of a child who attends general education classes with an aide and who is not in an SCC program.

6
7

(AR 1240 (CL 58); *see also* AR 698-99.)  The ALJ also noted testimony that SCC staff work on pre-teaching material before exposure in general education classes.  (AR 1214 (FF 52).)

8
9
10
11
12
13
14
15

The Parents argue the IDEA does not authorize the paring down of IEP elements and note the ALJ's apparent recognition that preteaching would be required for M.M.'s participation in science at Thornton Creek.  However, SPS was not required to adopt the Parents' preference for a pretreaching accommodation, and the Parents do not refute either the ALJ's logic in distinguishing the need for preteaching in a general education versus an SCC environment, or the testimony that preteaching for general education classes occurred as a matter of course in the SCC.   The absence of a preteaching accommodation for general education classes did not deny M.M. a FAPE.[10]

16

      e.   <u>Instructional aide</u>:

17
18
19
20
21

The IEP provided for a 1:1 instructional aide, as a behaviorally related accommodation, for the first thirty days of the term to assess the level of support needed and to be continued if data indicated a need.  (AR 1606.)  The Parents challenge the failure to provide an aide beyond the first thirty days and maintain they are not required to rely on representations that time for services set forth in an IEP will later be adjusted as deemed necessary.

22
23

---

[10] The IEP also includes different, but relevant accommodations in providing for extra time to process information, frequent, daily checks for understanding, and ongoing skills analysis and targeting of missing component skills to a high level of fluency and mastery before moving on.  (AR 1606-07.)

ORDER
PAGE - 32

The ALJ identified evidence supporting the sufficiency of the IEP as written.  In addition to the testimony of SPS witnesses confirming the 1:1 aide would continue if necessary (*see*, *e.g.*, AR 754-55), the record includes an abundance of evidence supporting a meaningful educational benefit served by the provision of an aide for a limited period of time.  The evidence includes M.M.'s expressed desire to participate with other students during instructional periods, rather than being taught 1:1; testimony that the adult-to-student ratio in the SCC provided for ample adult attention and that the ability to move away from a 1:1 aide would enhance M.M.'s ability to function more independently; and the Father's testimony that M.M. "prefers to be independent, and works best when his aide is on the periphery and steps in as needed."  (AR 1218 (FF 68) and AR 68, 612-14, 664-72, 778-80, 787-88). The ALJ also considered Dr. Prosch-Jensen's testimony of the "very loud and distracting" APL classroom; the Parents' observation M.M. experiences sensory overload with too much activity or noise; the OT testimony that M.M. is easily distracted and over-aroused; and Dr. Studley's opinion M.M. would have less need for a 1:1 aide for redirection if in a classroom with fewer people and less noise.  (*Id*. (FF 69).)

The ALJ found SPS reasonably relied on the views of Dr. Prosch-Jensen and Celms as to M.M.'s motivation to work with other children rather than a 1:1 aide, and that he regularly engaged in more off-task behavior with the aide than in group settings, was highly dependent on the aide for redirection, and worked in a noisy and distracting classroom.  (AR 1238 (CL 49).) She found SPS's choice reasonably calculated to offer M.M. a meaningful educational benefit, considering he would have fewer distractions and may not need constant redirection and reinforcement from an aide in the smaller, quieter SCC, thereby increasing his independence. The Parents' contrary beliefs were reasonable, but did not overcome SPS's determination based on the evidence of record.  The Parents here, as before the ALJ, do not establish the IEP's

provision for a 1:1 aide deprived M.M. of a FAPE.

    f.  <u>Behavioral intervention plan</u>:

  Washington State requires the inclusion of a behavioral intervention plan (BIP), if determined necessary by the IEP team for the student to receive a FAPE.  WAC 392-172A-03090(1)(h).  The Parents argue the IEP's BIP was inappropriate in targeting only task avoidance and ignoring other behaviors related to attention-seeking and impulse control.  They note that state law requires a BIP addressing "behavior(<u>s</u>)", WAC 392-172A-01031 (emphasis added), and contrast Dr. Studley's testimony that it is common to target only one behavior at a time, with the testimony of their BCBA that M.M. could quickly regress if this were done.

  The Courts finds the BIP appropriate.  It addresses a "cluster of behaviors" that appeared to be linked to task avoidance, and describes the targeted behavior as "[t]ime on task during academic and non-preferred activity times."  (AR 1598.)  It also acknowledges other behaviors, including dysregulation and any new behaviors that interfere with the ability to participate and safely access the general education classroom.  (*Id*.)  It proposes responses covering a wider array of behaviors than task avoidance, such as immediate adaption to M.M.'s needs and adjustment of programming as necessary for a dysregulated state, and consequences for when he bolts from instructional space, displaces/destroys materials, and curses.  (AR 1598-99.)

    g.  <u>Frequency of services</u>:

  The IEP must identify the projected date for beginning services and modifications, and the anticipated frequency, location, and duration of those services.  20 U.S.C. § 1414(d)(1)(A)(i)(VII). The Parents allege a substantive IDEA violation in relation to the frequency of services, but do not appear to set forth any specific argument for the Court's consideration.  This allegation may target the inclusion of "as needed" or daily frequency and duration designations

ORDER
PAGE - 34

in the IEP.  The ALJ indicates the Parents objected to the IEP's inclusion of training "as needed" while raising no objection to the many other "as needed" provisions for accommodations/ modifications.  (AR 1237 (CL 45).)  She concluded:

> The frequency and duration of some services, most notably specially designed instruction and related services, must always be stated in exact minutes, not only because of their centrality to a student's program, but also because the LRE/placement calculation cannot be made without knowing the number of minutes the student spends in special education vs. general education.  Some provisions in an IEP may be appropriate with a frequency of "as needed" rather than X minutes per week, but this *depends on the individual needs of the student*. "As needed" makes clear to parents that the agency's commitment is zero minutes unless and until there is a need.  Thus, if parents believe a particular level of commitment of resources is needed, they may advocate for that at the IEP meeting.

(AR 1237-38 (CL 46) (emphasis in original).)  She also specifically addressed hours for training, as discussed above.

SPS argues this type of claim is characterized in the Ninth Circuit as procedural, not substantive.  *See*, *e.g.*, *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 953 (9th Cir. 2010).  In any event, whether viewed as procedural or substantive, the Parents do not establish the use of the terms "as needed" or "daily" caused the loss of an educational opportunity, seriously infringed on their participation, or denied M.M. a meaningful benefit.

D.    Predetermination of Placement for 2014-2015 School Year

The IDEA requires that school districts ensure parents are members of any group making decisions as to their child's educational placement.  20 U.S.C. § 1414(e); 34 C.F.R. § 300.327; WAC 392-172A-03115, -05000.  "A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement."  *K.D. v. Dep't of Educ.,* 665 F.3d 1110, 1123 (9th Cir. 2011).  The placement decision must "be based on the IEP, and not vice versa."  *Id.*

The Parents maintain SPS improperly predetermined to place M.M. at Thornton Creek before the September 2, 2014 IEP meeting and without discussing the placement with them, and that this predetermination denied them meaningful participation in the decision making process. The evidence does not support their contention.

The Parents, for example, contend Dr. Studley cut off an attempt to discuss APL at the IEP meeting and identified the purpose of the meeting as selecting a district placement.  As observed by the ALJ, M.M.'s Father testified Dr. Studley interrupted someone's statements regarding APL "to say that they were not here to extoll the benefits of APL", while Dr. Studley testified she was put on the IEP team "to see *if* the team could propose a school district placement."  (AR 1208 (FF 31) (emphasis in original); *see also* AR 108, 639.)  Dr. Studley's testimony refuted the allegation of predetermination in other respects.  She explained:  "I often propose things without a strong attachment to the proposal simply because something needs to be worked from.  The idea that we would create a 25-page document from scratch at a meeting seems impractical."  (AR 658-59.)

The Parents contend the IEP itself and Swanson's testimony demonstrate private school was not considered.  However, the IEP indicates consideration of placement options with varying percentages of time spent in a regular classroom (AR 1610), while Swanson merely agreed on cross examination that that particular part of the IEP did not indicate private school was considered, and echoed Dr. Studley's testimony the IEP reflected only a proposal for placement.  (AR 750-51.)  Other evidence, such as the fact SPS sent Dr. Prosch-Jensen and Celms to observe APL before drafting the IEP and the PWN discussion of APL, shows SPS considered the placement preferred by the Parents.  (AR 1208-09 (FF 31) and AR 1612-13.)

ORDER
PAGE - 36

As found by the ALJ:

A school district is required to come to the IEP table with an "open mind," but not a "blank mind". A district may come to an IEP meeting with a draft IEP for discussion and having given thought to a placement. However, it must not finalize its placement decision prior to the IEP meeting.

(AR 1233 (CL 27) (citing *Doyle v. Arlington Cnty. Sch. Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992)).) (*See also* AR 1233-34 (CL 27, 28) (finding Dr. Studley's statement about not extolling APL "may reflect her preference for a different placement, but it also may reflect the fact that choosing an educational placement and the school where it will be located must await the end of the IEP process.")) The Ninth Circuit, in fact, recently noted the absence of any authority for a contention a parent or guardian "is prevented from 'participating' in the IEP process if the school district first prepares an offer to be discussed at the IEP meeting, instead of conducting a free-wheeling discussion and then creating an offer," and saw "no logical reason that such would be the case." *Baquerizo* 2016 U.S. App. LEXIS 11307 at *17.

Here, as in *Baquerizo*, the evidence does not show the preparation of an IEP "without parental input, with a preexisting, predetermined program and a 'take it or leave it' position[.]" *Id.* The evidence shows the preparation of a proposal for a public school placement, the consideration of the Parents' preferred placement, and give and take between the parties before public school was selected. *See, e.g., K.D.*, 665 F.3d at 1123 (that a district gave thought to or "scouted out" a potential placement is not conclusive evidence of predetermination; record showed district considered other options and reasonably rejected them).[11]

---

[11] The predetermination cases cited by the Parents are distinguishable. *See, e.g., W.G. v. Board of Trustees of Target Range School Dist. No. 23*, 960 F.2d 1479, 1481-84 (9th Cir. 1992) (district independently developed IEP, without any input from others, advocated predetermined placement at meeting, with no consideration of alternatives and a "'take it or leave it' position", never attempted to

E.     Placement for 2014-2015 School Year[12]

    1.     Least restrictive environment (LRE):

The IDEA describes the LRE requirement as follows:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a)(2)(ii); WAC 392-172A-02050.  *See also* 34 C.F.R. § 300.116(a)(2).   This "sets forth Congress's preference for educating children with disabilities in regular classrooms with their peers."  *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. by & Through Holland*, 14 F.3d 1398, 1403 (9th Cir. 1994) ("*Rachel H.*").

The inquiry into what constitutes the LRE is necessarily individualized and fact-specific. *Poolaw v. Bishop*, 67 F.3d 830, 834, 836 (9th Cir. 1995).   The Court must balance the tension between the preference for educating a disabled child in a regular classroom and the requirement to provide an individualized program tailored to the specific needs of the child.   *J.W.*, 626 F.3d at 448.   The Court applies a four-part balancing test to consider whether a school district appropriately placed a child outside of a regular classroom setting, considering (1) the

---

reconvene meeting to include required participants, and stated district did not have a duty to comply with requests for changes, but student was welcome to have IEP administered at public school); *R.L. v. Miami-Dade County Sch. Bd.*, 757 F.3d 1173, 1188-90 (11th Cir. 2014) (school representative stated private placement was not an option, that placement would be public school, and parents would have to pursue mediation if they disagreed); *Sam K. v. Hawaii Dep't of Educ.*, 60 IDELR 190 (D. Haw. 2013) (attached to Dkt. 27-1 at 81-82) (public school director only potential placement director to attend IEP meetings and handwritten note supported conclusion of predetermination months before final IEP), *aff'd on other grounds by* 788 F.3d 1033 (9th Cir. 2015).

[12]   Because the Court finds the IEP appropriate, the Parents' related argument that the Thornton Creek placement was not based on a properly formulated IEP lacks merit and is not further discussed.

educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect the student has on the teacher and children in the regular class, and (4) the costs of "mainstreaming" the student (now called "inclusion").  *Rachel H*., 14 F.3d at 1404.  *See also Baquerizo*, 2016 U.S. App. LEXIS 11307 at *19-21 (applying *Rachel H.* factors).

SPS provided for M.M.'s placement in a general education setting, with typically developing peers, for nineteen percent of his day, including recess, lunch, science, assemblies, school activities, physical education, and field trips, and the remainder of his day in a special education setting, including academics other than science, OT, study skills, and part of social skills instruction.  (AR 1213 (FF 47), 1235 (CL 37), and 1609-10.)  The SCC consisted of eight students, one teacher, and two instructional assistants.  (AR 1213 (FF 48), 1235 (CL 37), and 1612.)  SPS determined M.M.'s goals could be met in a public school setting, allowing him to become more independent and reduce his reliance on adults to control his behavior, and that he would make more progress, both academically and socially, with small groups of two-to-three students working on similar goals.  (AR 1236 (FF 38) and 1612.)

In rejecting the Parents' preferred placement, SPS noted the environment labeled as "general education" by APL contained some half the students in a public school general education class, and that ten-to-fifteen out of seventeen students had special needs.  (AR 1612.) SPS found APL required M.M. to have "direct and substantial support from one to two adults for most of the day," and allowed for only fifteen minutes of independent time on task for academic instruction.  (*Id*.)  SPS proposed a special education classroom "that is much smaller and more highly structured, and in which [M.M.] can gain greater independence."  (*Id*.)

Testimony showed all eight SCC students were on the autism spectrum, with one student spending about thirty minutes per week in the SCC, two others attending, *inter alia*, general

education math, and three of the eight not attending any general education classes.  (AR 1213-14 (FF 51).)  With one exception, none of the SCC students were taught primarily 1:1:  "They are generally taught in groups of two to three, though sometimes individually.  The teacher tries to give one whole-group academic lesson per week."  (AR 1214.)  SCC staff work on pre-teaching material before general education class exposure.  (*Id*.)  Thornton Creek also has a "'reverse inclusion'" program, wherein ten nondisabled peers come to the SCC for thirty minutes each Friday, and three nondisabled third grade girls come weekly for breakfast.  (AR 1213 (FF 50).)

The Parents presented evidence of M.M.'s preference for placement with typical or high-functioning peers, his modeling of their behavior and better response to their social feedback than from adults or perceived lower-functioning peers, and the benefit from participation in lessons discussing grade-level texts.  (AR 1215 (FF 58).)  SPS presented evidence casting doubt on whether M.M. was making meaningful progress at APL.  (*Id*. (FF 59).)  Dr. Prosch-Jensen and Celms observed M.M. receiving most of his academic instruction 1:1 from an aide, who provided "almost constant behavioral reinforcement or prompting[.]"  (*Id*.)  Celms and Dr. Studley believed M.M. would benefit more academically and socially working in groups of two or three, receiving specially designed instruction at a similar level, instead of 1:1 instruction in a classroom where others were working significantly above his instructional level.  (*Id*.)  Celms believed M.M. did not have any greater participation with non-disabled peers at APL than he would have had in the District's placement.  (*Id*.)

The ALJ considered that three of the eight students in the SCC were higher functioning than M.M. and took most academic subjects either in general education classes or in the general education curriculum in the SCC.  (AR 1216 (FF 61).)  M.M. would have participated with those higher functioning peers in the SCC and general education setting, and be among typically-

ORDER
PAGE - 40

developing peers for almost twenty percent of the day.  (*Id.*)  The ALJ construed the evidence as showing M.M. did not make a judgment about whether other students were "disabled vs. non-disabled" and, rather, that his perception of their higher or lower functioning mattered.  (*Id.* (FF 61-62) (describing M.M.'s critical statements of lower-functioning peers and positive statements of higher-functioning peers, and his friendships with both typically-developing and higher functioning disabled peers at APL).)

The parties presented conflicting testimony as to the number of disabled and typically-developing students in M.M.'s APL class.  Simon testified twelve of the sixteen students were on her caseload, eight of that twelve had APL treatment plans (the equivalent of IEPs), and she spent little time on the four other students, consisting of consulting with the classroom co-teachers on behavioral and environmental strategies and with regard to reviewing and analyzing data.  (AR 127 (FF 63); AR 252-55.)  Moors Lipshin described four different levels of students: Level 4 are disabled and require a 1:1 aide, Level 3 are less impacted and require a 2:1 aide, Level 2 typically have attention deficit disorder or specific learning disabilities, and Level 1 are typically developing; Levels 4 and 3 are always supervised by a BCBA and Level 2 are supervised by a BCBA if required by health insurance.  (AR 127 (FF 63); AR 456, 478.)  She testified about half of the APL class had disabilities and about half was above grade level in reading and/or math.  (AR 127 (FF 63-64); AR 423-26.)  Considering this evidence, the ALJ found it unclear how half of the class could be typically-developing when "12 of the 16 (three-quarters) must be Level 4, 3, or 2 students because they are served by a BCBA[,]" and concluded there were four typically-developing and twelve disabled children in M.M.'s APL class.  (*Id.* (FF 64).)  She also noted Dr. Prosch-Jensen's statement she was told during her 2013-2014 observation that four of the student in M.M.'s class that year were typically-developing.  (*Id.*)

In reaching her conclusions of law, the ALJ noted M.M.'s desire to model himself on higher-functioning peers.  (AR 1234 (CL 34).)  She stated the LRE analysis is based in large part on the degree of participation with typically-developing peers, not disabled but higher functioning peers, and found the evidence did not reflect that M.M. modeled himself only on typically-developing peers.  (AR 1234-35 (CL 34).)

The ALJ identified the existence of at least two environments less restrictive than the SCC at Thornton Creek, including the inclusion model at John Rogers Elementary selected for the prior year and the APL model.  (AR 1235 (CL 37).)  In selecting the SCC, the District relied on Dr. Prosch-Jensen's observation that M.M. engaged in class activity or instruction at APL only forty-one percent of the time, "despite a very rich diet of reinforcements, low work expectations, and intensive 1:1 intervention[,]" that he should have been engaged at least two thirds of the time, and that the APL classroom was excessively noisy and distracting.  (AR 1235-36 (CL 38).)  The District also relied on Celms' observation "of a child who was isolated in 1:1 instruction, wanted to work with a small group but was not allowed to, and regularly misbehaved in the 1:1 setting."  (*Id*.)  Celms interviewed four APL staff, reviewed APL records, and conducted her own observation, and opined that although M.M. "was in a classroom with four typically-developing peers, he was largely working apart from them."  (AR 1236 (CL 38).)  At hearing, Dr. Prosch-Jensen testified the APL performance data showed M.M. had made no meaningful progress on eleven out of seventeen annual goals in 2013-2014.  (*Id*. (CL 39).)

Applying the snapshot rule, the ALJ concluded:

The District did due diligence in investigating the Parents' preferred placement, in which the Student has more physical presence with typically-developing peers, before concluding the Student was not making significant progress in that placement and was not sufficiently participating with those peers due to the predominance of 1:1 instruction.

ORDER
PAGE - 42

1   (*Id.* (CL 41).)  She acknowledged, but found less compelling, contrary evidence from APL staff,

2   Dr. Malmquist, and M.M.'s Father, and concluded the Parents failed to show the District chose

3   an inappropriate placement or that the placement was not reasonably calculated to provide

4   meaningful benefit.  (*Id.* (CL 39-41).)

5   The Parents here direct the Court's attention to APL.  They maintain APL is the LRE in

6   providing for M.M.'s education in a classroom with at least four nondisabled peers for eighty to

7   ninety percent of the day and access to the general curriculum in all subjects.  They apply the

8   *Rachel H.* factors to APL, assert Dr. Studley's bias to the use of instructional aides in inclusion

9   classes, and maintain APL offers a general education inclusion class by any measure.  The

10  Parents aver that, because APL is a less restrictive environment than the SCC at Thornton Creek,

11  M.M. is entitled to placement there even if he might obtain some or even greater benefit in the

12  more restrictive public school environment.  *See, e.g., Oberti v. Board of Educ.*, 995 F.2d 1204,

13  1217 (3d Cir. 1993) (that a child might make greater academic progress in a segregated special

14  education class or will learn differently from his education in a regular classroom does not justify

15  exclusion from a regular classroom); *G.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 552,

16  574-79 (S.D.N.Y. 2010) ("In order for the scales to tip in favor of an integrated environment, the

17  Court need only determine that, 'with appropriate support and services,' [the student] could

18  'make progress toward [her] IEP goals in the regular education setting.'")

19  The Court must, however, first consider whether SPS provided an appropriate

20  educational placement for M.M.  As stated by the Ninth Circuit:

21       Our de novo review . . . must focus primarily on the District's proposed
         placement, not on the alternative that the family preferred.  Even if [the Parents'
22       preference was better for the student] than the District's proposed placement, that
         would not necessarily mean that the placement was inappropriate. We must
23       uphold the appropriateness of the District's placement if it was reasonably

ORDER
PAGE - 43

calculated to provide [the student] with educational benefits.

*Gregory K.*, 811 F.2d at 1314.  *Accord M.D. v. Dep't of Educ.*, 864 F. Supp. 2d 993, 1003 (D. Haw. 2012) ("[A]lthough a family's preferred schooling may be more beneficial for the student than the DOE's proposed placement, this alone does not make the DOE's placement inappropriate.")  In other words, if the Court finds SPS identified an appropriate educational placement, the inquiry stops there.  *Cf. Briggs v. Board of Educ.*, 882 F.2d 688, 693 (2d Cir. 1989) (stating the role of the district court is limited to determining whether a school district complied procedurally and substantively with the IDEA, not to decide whether the same services offered in a district's placement could be provided in a "less segregated" private school setting).

Consideration of the LRE forms part of the Court's inquiry.  *See Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 294 (7th Cir. 1988).  However, the IDEA's preference for the education of disabled children alongside nondisabled children is not "an absolute commandment." *Poolaw v. Bishop*, 67 F.3d 830, 834, 836 (9th Cir. 1995).  Indeed, the IDEA's implementing regulations account for this fact by requiring school districts to provide a continuum of alternative placements to meet the needs of disabled children, ranging from "instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions[,]" as well as supplementary services, such as a resource room, to be provided in conjunction with "regular class placement."  20 C.F.R. § 300.115.  *See Rowley*, 458 U.S. at 181 n.4, 197 n.21 (despite the preference for mainstreaming, the IDEA expressly acknowledges that a satisfactory education in "regular classes" may not be achieved and "thus provides for the education of some [disabled] children in separate classes or institutional settings."); *Board of Educ. v. Illinois St. Bd. of Educ.*, 41 F.3d 1162, 1168 (7th Cir. 1994) (in requiring a continuum of program options, "the regulations contemplate that mainstreaming is not required in every case.")

As the ALJ explained in this case (AR 1235 (CL 36)), the LRE requirement is subject to and must be balanced with the IDEA's primary objective of providing an appropriate education to students with disabilities. *B. S. v. Placentia-Yorba Linda Unified Sch. Dist.*, No. 07-56477, 2009 U.S. App. LEXIS 155 at *5-6 (9th Cir. Jan. 5, 2009) (citing *Wilson v. Marana Unified Sch. Dist.*, 735 F.2d 1178, 1183 (9th Cir. 1984)). "While every effort is to be made to place a student in the [LRE], it must be the [LRE] which also meets the child's IEP goals." *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1467-68 (9th Cir. 1996). *See also Illinois St. Bd. of Educ.*, 41 F.3d at 1168 ("[T]he mainstreaming requirement was developed in response to school districts which were reluctant to integrate mentally impaired children and their non-disabled peers. It was not developed to promote integration with non-disabled peers at the expense of other IDEA educational requirements and is applicable only if the IEP meets IDEA minimums.")   Placement in an inclusion class is not appropriate where the nature or severity of a child's disability is such that education in a regular educational environment cannot be achieved satisfactorily. *Briggs*, 882 F.2d at 692.

Here, neither party suggested M.M. would be served by or advocated for his placement full-time in what would be commonly understood as a "regular" classroom setting.  The Parents maintained, for example, that M.M. could not be in a class with more than seventeen students (AR 97, 139-40), and Dr. Studley concluded that a placement for "any great part of the day in the general education setting in a public school seemed inappropriate[.]"  (AR 611, 687.) (*See also* AR 433 (Dr. Malmquist testified to risks associated with larger groups)).  Dr. Studley explained that SPS had offered an inclusion model for M.M. at John Rogers Elementary for the 2013-2014 school year, involving classes with twenty-six students or under, based on the fact they were told M.M. had been spending most of his day in the general education setting.  (AR 686.)  SPS

offered the SCC model after observing that most of the students in the APL classroom were disabled in some way, did not appear to be working at the general education grade level, and in a number of cases had 1:1 assistants, revealing a classroom "[t]hat in no way resembles general education as [SPS] understood it in the public schools."  (AR 687; *see also* AR 681-82.)[13]

The APL class – with twelve disabled students out of sixteen total and ten adults (*see* AR 187 (including Simon, two co-teachers, and seven paraeducators)) – is not reasonably described as offering a regular classroom setting or general education environment as those terms are utilized or understood in relation to federal and state law.  While the Parents accurately note the absence of a definition of "general education" in law or policy, or any prescribed ration of students with and without disabilities, they fail to identify any case or other authority considering a similar classroom composition as a regular classroom or general education setting.  APL, in fact, arguably offers a "special" class or school as described in relation to the LRE and continuum of alternative placements. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. §§ 300.114(a)(2)(ii), 300.115(b)(1); WAC 392-172A-02050.

The Parents focus on the LRE's directive to educate disabled students with "children who are not disabled." 20 U.S.C. § 1412(a)(5)(A); *accord* 34 C.F.R. § 300.114(a)(2)(ii); WAC 392-172A-02050.  However, that phrase is utilized in conjunction with the different types of educational environments identified. *See*, *e.g.*, § 1412(a)(5)(A) ("To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, *and*

---

[13] Dr. Malmquist testified she could not describe the instructional setting in M.M.'s 2014-2015 APL class as similar to what she would expect to see with typically-developing students "in the details." (AR 345.)  That is, while the class viewed as a whole was "definitely inclusion" and M.M. was able to participate in higher level instructional programming by, for example, listening, she could "not get away from that fact . . . that this is a specially-designed instruction that is actually designed to – at his instructional level."  (AR 345-46.)

ORDER
PAGE - 46

special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature of severity of the disability of such a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.") (emphasis added).

The preference for education with nondisabled students can, moreover, be satisfied in different ways, including the apportioning of a disabled child's day between segregated and regular classroom settings. *See, e.g., A.M. v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 781 (9th Cir. 2010) (finding placement appropriate where district persuasively argued student could not receive a meaningful education in a full-inclusion general-education setting, evidence showed would have benefited from special-education classroom, and program offered mainstreaming opportunities at lunch and recess and the opportunity for mainstream classes with performance above the special-education curriculum); *Beth B. v. Van Clay*, 282 F.3d 493, 499 (7th Cir. 2002) ("The ELS classroom, so long as it includes reverse mainstreaming opportunities, as well as time spent with nondisabled peers in nonacademic classes, during special projects, lunch, and the like, is at an acceptable point along the 'continuum of services' between total integration and complete segregation, and satisfies the requirement [to] mainstream[] to the maximum extent appropriate."); *Evans v. District No. 17*, 841 F.2d 824, 832 (8th Cir. 1988) (describing LRE requirement as: "In other words, children who can be mainstreamed should be mainstreamed, if not for the entire day, then for part of the day[.]")  The preference for inclusion does not require a school district to "reject intermediate degrees of mainstreaming when such a placement is otherwise justified by a [disabled] child's educational needs." *Lachman*, 852 F.2d at 296 n.7 (citing *Wilson*, 735 F.2d at 1183).  Parents also have no right "to compel a school district to provide a specific program or employ a specific methodology." *Id.* at 294-97.

ORDER
PAGE - 47

Nor is it clear the preference for the LRE would favor, as presented in this case, exposure to a small number of nondisabled students for a larger portion of a day, over exposure to a large number of nondisabled students for a shorter portion of a day. The LRE inquiry is, as stated above, necessarily individualized and fact-specific, *Poolaw*, 67 F.3d at 834, and must be balanced with the primary objective of providing an appropriate education, *Wilson*, 735 F.2d 1183. The evidence here supported the conclusion that, although M.M.'s APL classroom included four nondisabled peers, he largely worked apart from those students due to his 1:1 aide and, even with that intensive, individualized support, made little progress in reaching his goals.

The Court concludes SPS provided for an appropriate educational placement. The Thornton Creek SCC was reasonably calculated to provide M.M. with educational benefits, including, but not limited to, the opportunity to gain greater independence, move away from a predominant reliance on 1:1 instruction, and make greater academic and social progress working in small groups of students with similar goals. In reaching this same conclusion, the ALJ properly considered both the benefits of the SCC placement and the evidence arguing against a placement at APL, including the above-described evidence casting doubt on M.M.'s progress at APL, identifying problematic aspects of the APL educational environment, and providing clarification as to the actual nature of that environment.

SPS also properly considered the LRE and appropriately placed M.M. outside a regular classroom setting. While there was no evidence as to the costs of inclusion, the remaining *Rachel H*. factors argue against placement full-time in a regular class and in favor of a day divided between special and regular educational environments. In addition to the greater academic/educational benefits identified, Thornton Creek allowed for M.M.'s education with children who are not disabled to the maximum extent appropriate, with some twenty percent of

ORDER
PAGE - 48

his day to be spent in a general education setting, including recess, lunch, assemblies, school activities, physical education, field trips, and a general education science class with twenty-four to twenty-six students (AR 1219 (FF 71)), as well as reverse inclusion opportunities in the SCC. In the general education setting, M.M. would be accompanied by an instructional assistant from his special education class[14] and provided the accommodations and modifications required by his IEP, thereby minimizing any potential impact on the teacher and other students resulting from unpredictable or disruptive behavior. (*See*, *e.g.*, AR 1218-19 (FF 67-72) and AR 492.)  The SCC provided a quieter classroom, with significantly fewer students and distractions, as well as a teacher and two instructional assistants.

The ALJ also properly incorporated into her LRE analysis the evidence showing M.M. preferred and benefited not only from his inclusion with nondisabled peers, but also from his interactions with disabled but higher functioning peers. (*See*, *e.g.*, AR 263 (Simon testified:  "If I didn't make this clear earlier, then I should have.  I know that the Student reacts differently to peers that he perceives have no disability.  So if a student is high functioning or has no disability, he responds differently than a student who is more significantly impacted by autism."))  This consideration was directly and appropriately responsive to one of the Parents' primary concerns regarding an appropriate educational environment for M.M., namely, his motivation to acquire and ability to model social and learning behaviors.

The Parents' belief in the superiority of APL over Thornton Creek is clearly sincere, and

---

[14] As noted above, the IEP called for a 1:1 instructional aide for thirty days, to be continued as needed.  (AR 1606.)  The ALJ pointed to the testimony of Swanson and Cook for the finding that M.M. would be accompanied in his general education classes by a special education aide.  (AR 1219 (FF 72).)  Swanson testified that aides were provided to students who needed that support during general education classes (AR 728), while Cook testified there was always one instructional assistant among the two or three students attending general education classes (AR 817-18).

the Court is sympathetic to their desire to continue with a placement they believe provides their child with the best possible educational and non-academic benefits.  However, the evidence shows SPS fulfilled its duty to identify a placement reasonably calculated to provide M.M. with educational benefits and properly balanced the objective of an appropriate education with the LRE requirement.  As such, whether or not APL could be deemed the best or a more beneficial placement, the District's proposed placement must be upheld.  *See Rowley*, 458 U.S. at 197 n.21; *Gregory K.*, 811 F.2d at 1314.

       2.    <u>Proximity to M.M.'s home</u>:

A disabled child's placement should be as close as possible to the child's home and, unless the IEP requires some other arrangement, the child should be educated in the school he or she would attend if not disabled.  *See* 34 C.F.R. 300.116(b)-(c); *see also* WAC 392-172A-02060(3) (in the event the student needs an arrangement other than his or her local school, "placement shall be as close as possible to the student's home.")  Here, the ALJ considered both Thornton Creek and APL, and deemed the former appropriate.  She noted the program proposed in the October 2014 IEP was not offered at M.M.'s neighborhood school, but was offered at one of the schools near his home.  (AR 1213 (47-48).)  The Parents allege, but do not establish the failure to explicitly acknowledge that their preferred placement was closer to their home undermines or justifies overturning the ALJ's well-supported determination.

       3.    <u>Potential harmful effects on M.M.</u>:

The Parents argue the ALJ did not properly consider potential harmful effects on M.M. They maintain that, if placed in a class without nondisabled peers for most of the day, M.M. would acquire behaviors of his disabled peers and learn the norms of the SCC, likely causing severe regression and affecting his ability to function in normalized settings.  However, the

ORDER
PAGE - 50

evidence contradicted the characterization of APL as a general education setting and established it contained only four nondisabled students and a majority of disabled students.  The evidence showed M.M. strove to model himself on nondisabled and higher functioning but disabled peers. The SCC model provided for M.M. to be in class with higher functioning disabled children and for inclusion in a general education setting containing far more than four nondisabled students. The ALJ properly considered the Parents' concerns and their perception of harm.

F.    SLP and OT Services for 2014-2015

The ALJ found no evidence the offered SLP services were inappropriate to meet M.M.'s needs.  Considering the one-month gap between the IEP that expired on September 3, 2014 and the IEP finalized on October 3, 2014, the ALJ found no entitlement to an equitable remedy given that the Parents could have "dual-enrolled" M.M. in order to receive SLP services, but there was no evidence they would have availed themselves of such services during the one-month period given that they had not done so in the years prior to or after that month.  (AR 1241 (CL 65-66).)

The ALJ found SPS offered inappropriate OT services beginning March 15, 2014.  (AR 1241-42 (CL 68-72).)   The Parents had purchased private, appropriate OT services for M.M. (AR 1243 (CL75).)  The ALJ found the Parents had no obligation to dual-enroll M.M. in order to receive the offered OT services because they were inappropriate and, therefore, found no basis for reducing or denying a remedy on equitable grounds.  (*Id*. (CL 76).)  She ordered the District to reimburse the Parents' out-of-pocket expenses for private OT services from March 15, 2014 through the end of the 2014-2015 school year, but not beyond because the IEP did not provide for extended school year (ESY) services in the summer.  (*Id*. (CL 77).)

The Parents state that the law relied on by the ALJ relating to dual-enrolled students applies only to "parentally placed private school students," that is, parents who opt for private

ORDER
PAGE - 51

school even though a school district offered an appropriate program.  However, because SPS did offer an appropriate program, M.M. is properly characterized as a parentally placed private school student.  While such students do not have the right to receive related services that would be available if enrolled in public school, 34 C.F.R. § 300.137; WAC § 392-172A-04035, the Parents could have, but did not make M.M. eligible for those services as a "dual-enrolled" or part-time public school student, *see* WAC §§ 392-172A-04010, 392-134-010, -020.

Nor do the Parents establish their entitlement to reimbursement for OT services over the summer.  The 2014-2015 IEP, as with the IEP for the following year, found M.M. not qualified for ESY services.  (AR 1611, 1613 and Trial Ex. 6 at 38, 40.)  The absence of a specific ESY finding for the 2013-2014 school year does not establish M.M. had been found qualified in that year.  The 2014-2015 IEP explained SPS "had not had an opportunity to serve [M.M.] and therefore has no evidence" he qualified for ESY.  (AR 1613.)  That IEP, like the IEP for 2013-2014, also applied for a year-long period.  (*See* AR 1525 and 1609.)  This appears to reflect no more than that the IEPs were, as required, determined annually.  *See* 34 C.F.R. § 300.116(b).  The Parents do not, for example, argue other services, such as those for math and reading, were required to be provided over the summer because they also applied for a year-long period.

G.     2015-2016 School Year

In July 2015, SPS requested APL provide relevant data and information to be considered in the development of M.M.'s IEP for the 2015-2016 school year.  (Studley Decl. at 2.)  APL provided updated progress reports on July 20, 2015.  (Trial Ex. 12.)  In crafting a proposal in anticipation of the IEP team meeting, SPS relied upon the information from APL, as well as input from the Parents, an OT, and an SLP.  (*See* Ex. 6 at 40.)

Dr. Studley, the Parents, M.M.'s Grandmother, LaRosa, a general education teacher, OT,

1   and SLP attended an IEP team meeting on July 31, 2015.  (*Id*. at 2.)  Moors Lipshin was invited,

2   but did not attend.  (*Id*.; Studley Decl. at 2-3.)  At the meeting, SPS made changes to correct

3   factual errors and a reading goal, changed the frequency of many of the accommodations and

4   supports from "as needed" to "daily", and changed the setting for OT services to be equally split

5   between special and general education environments.  (Trial Ex. 6 at 33-34, 37, 39.)  SPS

6   proposed a placement at Sacajawea Elementary, in a SCC with eight students, one teacher, and

7   two instructional assistants.  (*Id*. at 39.)  A 1:1 instructional aide would be provided initially for

8   sixty days and continued if data indicated a need.  (*Id*. at 34, 39.)

9          The IEP team discussed other placements at the meeting, including different programs at

10  M.M.'s neighborhood school, Laurelhurst Elementary, and APL.  (*Id*. at 39-40.)  The District

11  rejected Laurelhurst as not providing an appropriate educational setting and rejected APL

12  because it could meet M.M.'s needs in one its SCC classrooms.  (*Id*. at 40.)

13         The IEP proposed M.M. spend 18.64 percent of his day in a general education setting,

14  including recess, lunch, assemblies, non-academic activities, and extracurricular activities of his

15  choice, and be provided "carefully monitored trial periods of academic activities in general

16  education" and amendment of the IEP to include the times and activities found to provide

17  benefit.  (*Id*. at 37.)  It proposed, based on the PLOP and need for small-group instruction, M.M.

18  not participate with nondisabled peers when receiving specially designed instruction in reading,

19  writing, math, social/behavior/organization, communication, and fine motor skills.  (*Id*.)

20         The PWN indicated M.M.'s IEP team would need to soon meet to amend the IEP, adding

21  objectives for each goal, as a required element for state-mandated testing requirements.  (*Id*. at

22  40.)  OT goals had estimated baselines and the OT at Sacajawea would need to work with M.M.

23  in the first weeks of school to gather baselines for affected goals, as well as writing objectives.

(*Id.*)  The IEP team would also need to meet before the start of December to look at data collected on M.M.'s "independence and whether he continues to require a 1:1 instructional aide." (*Id.*)  While the team did not qualify M.M. for ESY, it would make sense to look at whether he required ESY in the spring, after staff had worked with him for several months.  Finally, in response to the Parents' inquiry into whether the team would reconsider the appropriateness of a self-contained placement if the Parents were able to provide data indicating M.M. could be successful in one of the programs at Laurelhurst, SPS indicated it would "consider any new data the Parents provide."  (*Id.*)

M.M.'s parents received a proposed final IEP on August 5, 2015 (Decl. of D.M. at 4) and, in an August 16, 2015 email, informed Dr. Studley they had forwarded the updated IEP to APL, as they had indicated they would need to do at the IEP meeting given their "inability to alone provide sufficient input on matters such as specific current performance levels."  (Trial Ex. 7.)  They anticipated receiving and would forward responsive information from APL.  Although they wanted to observe at Sacajawea after the start of the school year, they could not agree to that placement and intended to enroll M.M. at APL for the fall.  They believed M.M. was "now capable of beneficially spending more time being educated with students who are non disabled than the District IEP and placement offers," and that placement in a SCC to the extent proposed would be harmful to his motivation and growth.  (*Id.*)  Given the team's "markedly different views" it seemed "very unlikely" they would reach a satisfactory consensus on moving M.M. into a "regular classroom at Sacajawea to any meaningful extent as time progressed."  (*Id.*)  APL had always been their "first choice" for placement.  (*Id.*)  They proposed Laurelhurst upon realizing the District "would be unlikely to consider placement at APL in light of the hearing[,]" and were uncertain whether a Laurelhurst placement was not appropriate, either as is or with

ORDER
PAGE - 54

supplemented services.   (*Id.*)   Also, whether or not SPS agreed to pay for APL, they wanted M.M. to receive the OT and SLP services identified in the IEP.

On August 31, 2015, the Parents filed the current action.  (Dkt. 1.)  The Court now finds no IDEA or state law violation established in relation to the 2015-2016 school year.[15]

1.   Information considered:

The Parents argue SPS failed to obtain and consider all necessary information prior to developing the August 2015 IEP.  However, SPS considered the evidence provided by APL and the Parents.  Other than correspondence pertaining to OT and SLP, there is no indication of further contact between the parties regarding the IEP after the Parents' August 16, 2015 email rejecting the proposed IEP and placement.  It does not appear the Parents supplied any further information from APL or made any additional proposals to amend the IEP.  To the extent other or more updated information existed, but was not provided, the fault does not lie with SPS.

The Parents also aver SPS failed to fulfill its duty "by anticipating Ms. Lipshin's attendance at a meeting (which she had not confirmed), particularly when Parents advised that APL's input was needed to ensure completeness and accuracy."  (Dkt. 27 at 37.)  Yet, the Parents do not identify any particular requirement not met by SPS or even provide an explanation for Moors Lipshin's absence.  The Court finds SPS properly obtained and considered all available information necessary to the formulation of the IEP.

2.   IEP content:

The Parents aver M.M. made greater strides than accounted for in the IEP, including

---

[15] In their trial brief, the Parents combine their arguments regarding 2014-2015 and 2015-2016. To the extent the arguments do not significantly differ as applied to those school years, the Court declines to repeat the analysis and finds it sufficient to state the same conclusions reached above apply equally to 2015-2016.  The Court focuses on the challenges specific to the 2015-2016 IEP and placement identified in the trial brief and associated declarations, and raised at trial.

ORDER
PAGE - 55

1    improved testing results and progress in the attainment of treatment plan goals and as reflected in

2    progress notes and routinely maintained data. Moors Lipshin contends M.M. continued to

3    receive instruction and participate in groups including nondisabled classmates to the extent

4    already testified to at hearing, amounting to seventy-four to eighty percent of the school day

5    through the end of the 2014-2015 school year and, at present, an average of ninety-percent of the

6    day. (Moors Lipshin Decl. at 14.) She points to the data as showing increases in M.M.'s

7    independent following of group directions and a reduction in the required number of prompts.

8       Moors Lipshin avers numerous specific errors in the IEP, including an inaccurate

9    identification of the number of disabled students in M.M.'s APL class, in various aspects of the

10    PLOP, particularly with respect to M.M.'s needs and abilities in relation to the "general

11    education curriculum" and its reliance on outdated or inaccurate information, an outdated and

12    inaccurate FBA and BIP, inaccurate baseline performance levels in some annual goals, and the

13    absence of needed program accommodations and modifications, such as M.M.'s needs in relation

14    to a BCBA and 1:1 instructional aide. (*Id.* at 16-22.) She also objects that the IEP provision for

15    M.M. to receive all of his reading and math instruction from an instructional assistant in the

16    special education setting affords him no exposure to instruction in those areas by a certificated

17    teacher or in an environment with nondisabled students, and that the time afforded M.M. to

18    participate in the general education setting is insufficient and likely to be harmful. (*Id.* at 22.)

19       M.M.'s Father reiterates many of the contentions of Moors Lipshin, and provides his own

20    observations of M.M.'s progress from April 2015 through the end of the 2014-2015 school year

21    and beyond. (*See* D.M. Decl.) He sets forth his overriding concern as the IEP's failure to

22    accurately reflect M.M.'s ability to participate in the general education curriculum with

23    nondisabled students and the harm resulting from a denial of such opportunity.

ORDER
PAGE - 56

As indicated above, although provided a draft of the IEP, there is no indication APL provided any input in response.  SPS did not, as such, have the opportunity to consider the arguments or all of the information now relied upon by the Parents.  The Court here considers the Parents' position and the available information in full, but with consideration of the snapshot rule.  The Court concludes SPS appropriately formulated the IEP to the best of its ability with the information available for consideration, *see Doe by Gonzales*, 793 F.2d at 1490, and that the Parents do not demonstrate the IEP was not appropriate.

Many of the alleged errors or deficiencies in the IEP reflect the Parents' preferences, but do not demonstrate the content adopted by SPS was not appropriate.  (*See, e.g.*, Trial Ex. 6 at 13 and Trial Ex. 12, treatment plan at page 3 (description of the number of words read per minute appropriately taken directly from 2014-2015 APL treatment plan); Trial Ex. 6 at 4 and Moors Lipshin Decl. at 17 (IEP points to a lack of impulse control and ability to delay gratification as posing an impediment to learning, it does not state M.M. lacked any ability whatsoever to delay gratification).)  Other areas of criticism, such as the provision for math and reading instruction by an instructional assistant, the time limitation on the services of a 1:1 instructional assistant, and the failure to include BCBA-related services, are consistent with the October 2014 IEP and/or lack merit for the same reasons discussed above and in light of additional IEP provisions. (*See, e.g.*, Trial Ex. 6 at 36 and AR 1609 (both IEPs provide for math and reading instruction by an instructional assistant), and Trial Ex. 6 at 40 (August 2015 PWN explained the Sacajawea SCC teacher was in the process of earning her BCBA certification and set a date by which the IEP team would meet, review data, and determine whether M.M. continued to require a 1:1 aide beyond the initial sixty-day period).)

Errors conceded by SPS are not reasonably construed as having a material effect on the

IEP's appropriateness.  For example, while the IEP misstates some grade equivalency math levels by a matter of months, the correct levels remain multiple years behind M.M.'s peers, and errors in the reporting of social/behavioral scores result in M.M. appearing more competent than he was and support the IEP's conclusion he required a more supportive environment.  (Trial Ex. 6 at 10-11 and Studley Decl. at 11, 13-15.)   Other apparent errors, such as the depiction of M.M.'s APL classroom as containing fifteen students with special needs and two students who are typically developing, rather than four out of sixteen students with no identified disability, are likewise not significant enough to undermine the appropriateness of the IEP as a whole.  (Trial Ex. 6 at 3; Studley Decl. at 7; and Moors Lipshin Decl. at 1-2, 6, 20.)

The Parents further fail, as a general matter, to demonstrate any improper reliance on outdated information or that SPS ignored evidence of M.M.'s improvement.  As stated by Dr. Studley, the inclusion of earlier information and data, along with more recently available information and data, allows for an understanding of a student's progress or lack thereof over time, and a more meaningful understanding of a student's current performance levels when viewed in historical context.  (Studley Decl. at 8.)  The IEP recognizes evidence of improvement in M.M.'s functioning in many different areas (*see* Trial Ex. 6 at 4, 6-19), and, as a matter of practical necessity, provides a summary of available information and data, rather than an exhaustive listing of all information and data relating to M.M.

The Parents advocate for different descriptions of information and data and believe the evidence supports greater or different abilities.  However, SPS was not required to adopt the Parents' preferences, *Ms. S.*, 337 F.3d at 1131-32, or to provide the "absolutely best or potential-maximizing' education" for M.M., *Gregory K.*, 811 F.3d at 1314.  Nor do the Parents otherwise demonstrate the IEP as formulated by SPS was not reasonably calculated to provide meaningful

educational benefit.  *J.W.*, 626 F.3d at 432-33.

3.    Placement/LRE:

SPS provided an appropriate educational placement for M.M. for the 2015-2016 school year.  The Sacajawea placement was reasonably calculated to provide M.M. with educational benefits, including, but not limited to, the opportunity to participate in small group instruction and reduce his need for a 1:1 assignment to an adult, in a school providing both self-contained and general education settings.  (Trial Ex. 6 at 39-40.)

The placement also reflects proper consideration of the LRE.  That is, as with the year prior, a split of M.M.'s day between special and regular educational environments provided for greater academic/educational and nonacademic benefits than placement in a full-time general education setting, and allowed for M.M.'s education with children who are not disabled to the maximum extent appropriate, including general education recess, lunch, assemblies, nonacademic activities, and any extracurricular activities of his choosing.  (*Id.* at 37.)  *See Rachel H.*, 14 F.3d at 1404.  While not repeating the prior year's offer of a general education science class, the 2015-2016 proposed placement opened the door to M.M.'s participation in the general education setting for academic activities through "carefully monitored trial periods" and amendments to the IEP with the times and activities found to provide him with benefit.  (*Id.*)  It also offered more in relation to a 1:1 instructional assistant, in addition to the sixty-day period ordered by the ALJ, by setting a deadline by which the IEP team would meet to review data on M.M.'s independence and reach a determination as to continued need.  (*Id.*)

The evidence shows SPS considered and provided adequate justification for rejecting the Parents' preferred placement.  Even with consideration of progress, including an increased ability to spend more time in group instruction at the time of and following the ALJ hearing, it

remains that the APL classroom – with its majority of disabled students, small number of nondisabled students, and large number of staff – does not constitute a general education setting. (Moors Lipshin Decl. at 1-2, 20.) (*See also* Prosch-Jensen Decl. at 2-5 and Moors Lipshin Rebuttal Decl. at 1-6 (reflecting different interpretations of M.M.'s educational progress over the 2014-2015 school year and the 2015-April 2016 partial school year).)   APL did not provide either a regular classroom setting or general education environment for even a reduced portion of M.M.'s day, or the self-contained classroom providing small group instruction SPS concluded would provide for a greater increase in his educational growth and his independence.   SPS properly rejected APL as a placement upon determining it could meet M.M.'s needs.[16]

SPS further considered and properly rejected other placements.  That is, as addressed in the PWN, explained by Dr. Studley, and not refuted by the Parents, none of the three different types of special education placements offered at Laurelhurst met M.M.'s educational needs.  (*See* Trial Ex. 6 at 39-40; Studley Decl. at 3-5; D.M. Decl. at 3, 6; and D.M. Rebuttal Decl. at 3 (the "resource program" provides services to students with only mild to moderate special education needs by providing targeted support in a general education classroom; the ACCESS program provides services to students with more intensive academic and functional needs, but who are still able to spend the majority of their instructional time in a general education classroom or setting; and the EBD program serves students with severe emotional and behavioral disabilities

---

[16] The Parents note Dr. Studley's testimony she picked Thornton Creek over Sacajawea for 2014-2015 because Thornton Creek "has a long history of including those students in the general ed setting for academics and social times very successfully, whereas Sacajawea does not."   (AR 619.)   However, Sacajawea was proposed instead of Thornton Creek for 2015-2016 because Cook, the Thornton Creek teacher, had left the school and the teacher at Sacajawea was better qualified to work with M.M. than Cook's replacement.  (Dkt. 25 at 4.)  Also, the PWN for the August 2015 IEP reflects the Sacajawea teacher was in the process of earning her BCBA certification (Trial Ex. 6 at 40), a qualification the Parents deem important.  Considering all of the evidence of record, the Court does not find Dr. Studley's testimony regarding Sacajawea to undermine the appropriateness of the 2015-2016 placement.

ORDER
PAGE - 60

that require them to spend most of their instructional time in a smaller group setting).)

The Parents again misplace their focus on their preferred, arguably more beneficial placement and do not establish the placement offered by SPS was not appropriate.  The evidence shows SPS fulfilled its duty to identify a placement reasonably calculated to provide M.M. with educational benefit and properly balanced the objective of an appropriate education with the preference for his education in the LRE.  The Court, accordingly, finds no basis for relief stemming from the placement identified by SPS for the 2015-2016 school year.[17]

4.      OT and SLP:

The August 2015 IEP called for a total of fifty minutes of OT services four times monthly, to be provided in and evenly split between special and general education settings. (Trial Ex. 6 at 36.)  It called for fifteen minutes of SLP services twice monthly.  (*Id.*)

The Parents aver that, after they requested OT and SLP services and dual-enrolled M.M. in the summer of 2015, SPS failed to offer those services in compliance with the IEP or when M.M. could access them without compromising his overall program.  However, the evidence shows OT and SLP services were made available to M.M., at a school near APL and at a time based on the service-provider's availability, but that M.M. failed to participate after an initial session due to interference with his APL schedule.  (*See* Trial Exs. 8, 13-16; D.M. Decl. at 7-9; and Studley Decl. at 17-18.)

While the Parents' concern as to conflicts between the OT services and M.M.'s APL schedule appears reasonable, they do not establish SPS failed to comply with any of its legal obligations.  *See generally* WAC 392-134-020(1)-(2)("ancillary services shall be provided to

---

[17] Counsel for the Parents clarified at trial that they no longer alleged a violation of the IDEA through the failure of an opportunity to visit Sacajawea when school was in session.

ORDER
PAGE - 61

part-time public school students at the same level and quality as provided by the public school to full-time students;" "ancillary services shall be provided to part-time public school students upon public school grounds or on sites which are controlled by a public school district"). The Parents' compliance argument appears to challenge the fact that the services offered did not provide for any OT in M.M.'s classroom or with his teachers. However, the IEP specifically called for the provision of some OT services in a "general education" setting (Ex. 6 at 36), a setting not offered at APL and not otherwise available to M.M. given the decision to reject SPS's proposed placement and to re-enroll M.M. at APL. The Court, as such, finds no OT-related award warranted.

CONCLUSION

The Court finds and concludes that Seattle Public School District provided M.M. a free appropriate public education for both the 2014-2015 and 2015-2016 school years. The Parents do not demonstrate a basis for reversing the ALJ's decision, for finding a violation of either federal or state law, or for their entitlement to the requested relief. The Clerk is directed to send a copy of this opinion to counsel for both parties.

DATED this 9th day of September, 2016.

Mary Alice Theiler
United States Magistrate Judge

ORDER
PAGE - 62